[Crim. No. 17616. Second Dist., Div. Five. Aug. 20, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
FORREST DILLARD AIKIN, Defendant and Appellant.

## Counsel

Ronald M. Sohigian, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Edward T. Fogel, Jr., Deputy Attorney General, for Plaintiff and Respondent.

## Opinion

**REPPY, J.**—Charged by an information with murder (Pen. Code, § 187), defendant was found guilty by a jury of second degree murder. He was sentenced to state prison for the term prescribed by law. He appeals from the judgment.

### The Facts and Evidential Process

The victim, Gloria Cramer (hereinafter, Gloria), and defendant, a merchant seaman, had carried on a sporadic and stormy romantic association for a number of months. Defendant was divorced. Gloria was married but lived with her husband only part time. She stayed with defendant over fairly extended periods in motel units which he rented while he was ashore. Both were heavy drinkers of intoxicating liquors; Gloria combined drinking with pill taking (barbiturates) quite regularly. Her husband considered her addicted to intoxicating liquors and drugs. She sometimes struck him when she was under their influence. Defendant testified that he combined pills and liquor on two occasions, at the time of the homicide and at the time of a fight hereinafter mentioned.

Strong feelings of love and hate alternately prevailed between defendant and Gloria, the latter often leading to the exchange of verbal insults and occasionally to combative physical encounters. One occurrence came to the attention of authorities about nine months prior to the homicide. As a result of it, Gloria was hospitalized and defendant was checked at the hospital and then jailed for a time. Charges were dismissed. Several more episodes of conflict, one happening a few days before the homicide, were overheard by occupants of adjacent rooms at the motel in Long Beach then occupied by defendant and Gloria.

The circumstantial evidence and pretrial and intrial statements of defendant indicate that Gloria died on the night of February 4, 1969 (a Tuesday), or early on the morning of the 5th. Gloria was seen by her husband in their own apartment on January 30, 1969. Gloria and her mother, who lived in Santa Maria, were very close, and the mother could recognize changes in the emotions of her daughter.

In December 1968 Gloria called her mother from a public telephone in the middle of the night, very excited, very disturbed, very frightened. She said that defendant was in a highly emotional state; that she thought he was under the influence of drugs or alcohol, or both, and she said that

she was very fearful of her life.[1] On January 28, 1969, calling collect from her own apartment, Gloria had an hour and a quarter telephone conversation with her mother. Gloria seemed all right at that time. On January 31, 1969, Gloria called her mother collect from the Long Beach Motel. She seemed disturbed at that time. She spoke of flying home in the next day or so. She appeared to be a little frightened. When her mother entered into a discussion about "where she was at" and getting away from that situation, Gloria spoke guardedly, responding only with "yeses" as though afraid to talk on the telephone. She appeared to be fearful of somebody close to the telephone, very afraid. She was disturbed.

Several days later Gloria's mother placed a person-to-person call to her at the Long Beach Motel.[2] Defendant answered. The mother overheard his talk with the operator. He seemed very nervous and told the operator that Gloria was not there, was at a lady friend's, and that he could not tell when she would be back. This could have been on Wednesday, February 5, 1969.

On Wednesday, February 12, the motel manager saw defendant through his (defendant's) motel room door, which was open. He was standing near it and watching television. On Thursday, February 13, defendant called the manager (apparently by telephone) and told her that he was leaving for San Francisco, saying that if his wife should call, to tell her that he would be back Sunday evening and that he would pay his rent then. Defendant did not contact the manager on Sunday. On Tuesday, the 18th of February, the manager rang and knocked at defendant's door. Getting no response, she unlocked it and called in, but an intense odor made her realize that something was wrong. The police were called, and the body was found. It was on the bed in a decomposed and discolored (darkened) condition. There were heavy bloodstains with hair mixed therein on the sheet. There was blood on the telephone receiver, and there were droplets of blood on the telephone cord, on the carpet and in the kitchen-bar area. There were smears of blood on a coffee table. There were traces of splattered blood on the jamb of the door leading from the main room, on the edge of the bathroom, and in the toilet and sink. A pair of men's shorts and a shirt, bloodstained, were found in a closet; the blood was not typed. Only the blood on the bedding, telephone and coffee table could be tested. These samples turned out to be type "A" which Gloria had. Defendant had type "O" blood. A number of notes which defendant had

---

[1]The trial court admonished the jury that this testimony was admitted only to show the state of mind of the deceased, not for the facts related.

[2]Undoubtedly this was the telephone call mentioned in one of the notes which defendant wrote after the incident.

written giving his reactions and attempting to account for the circumstances were found. They were received in evidence.

An autopsy disclosed that death was due to an acute subdural hematoma, traumatic, on the left side of the head. There was a skull fracture at the base of the brain. The injuries were said to be due to two forceful blows (not possibly involved in a fall) by something that had a blunt or smooth surface, which could have been a hand. It could be told by subtissue examination that there were bruises of recent origin on the thighs. No bruises or signs of beating about the face were found, but the decomposition and discoloration of the skin could have made such signs indistinct. A toxicologist found a barbiturate level of 2.3 milligrams percent of short-acting barbiturates in Gloria's liver. This was signficant, but, for a confirmed user of barbiturates, the level was somewhat lower than median.

An indication of what happened in the motel room on the night of February 4th or in the early morning hours of the 5th, and thereafter, was provided by police testimony detailing a pretrial statement made by defendant to them, by the trial testimony of defendant himself, and by some of the notes that he wrote. Defendant and Gloria ordered and had delivered from a pharmacy 60 seconal tablets, and defendant had on hand a quart of beer and a fifth of vodka. They had a hamburger dinner on the evening of the 4th. Defendant drank beer. Gloria, vodka. They both took pills.

Defendant claimed that he had no memory of anything else that happened after dinner until he awakened on the bed on the morning of the 5th. He claimed he was in his clothes. When he stood up he saw Gloria lying on the floor, nude. He claimed that he thought she was asleep and that he let her lie there about an hour. He then checked her for breathing, did not think she was, and gave her mouth-to-mouth resuscitation. About an hour after that he placed her on the bed and tried resuscitation again. He claims that he remained with the body until he left on February 13th; that he drank intoxicating liquor and took a number of the remaining pills, describing one episode in such a way as to indicate a possible gesture at suicide. Defendant did not call a doctor or the police. He testified that he recalled wiping up the floor and wiping Gloria's face.

When defendant left the motel, he went first to San Diego, then to Las Vegas, then back to the Los Angeles area, then to San Francisco, Portland, and Seattle. In Seattle he worked some for a tugboat company because he was low on money. He then returned to the Los Angeles area and took steps

to sign out on a ship. However, he did not complete this move because he saw his name on a list kept at the employment center[3] for men wanted for criminal offenses. He went back to San Diego and then returned to Wilmington where he registered at the Don Hotel, first under his middle name and then under his regular surname. The police learned he was there. After knocking on the door of his second-story room and announcing their presence and hearing no response, they unlocked the door with a passkey; but they were able to open it only partly because it was restrained with a night chain. Hearing shuffling noises, they broke open the chain, entered and found defendant in the middle of the room. A window opposite him was open with the lower drapes hanging outside. Apparently a notebook containing more written thoughts of defendant was found.[4]

At trial, a Mrs. Jeanne Lair, who managed the Islander Motel in the summer of 1968, testified[5] that (seemingly on an occasion within that period) she had overheard defendant and Gloria fighting; that she could hear slapping and foul language, breaking glass, the sound of striking and moaning; that she also had heard the sound of a body falling against the wall and defendant telling Gloria to get up off the floor. Mrs. Lair further testified that on many occasions she had stopped fights; that defendant and Gloria however would get together after their arguments.

A Mrs. Ocite Broussard was called during the presentation of the defense. She lived at Shangri Lodge where defendant and Gloria had sojourned part of the time together in the summer of 1969. After eliciting from her that she had seen Gloria under the influence of alcohol many times, defense counsel asked her if she had ever seen defendant with bruises on his face. The deputy district attorney interposed an objection on the grounds of immateriality. Defense counsel argued that the answer would be material as providing an inference that some of the blood in the motel room where Gloria died could have been that of defendant, and that it was supportive of the defense position, mentioned in his opening statement, that Gloria would attack defendant at times. However, the objection was sustained.

Prior to the commencement of trial, upon motion of defendant, the trial court (acting through a judge other than the one who presided at trial) appointed Dr. George Y. Abe, a psychiatrist, to examine defendant "pursuant to Sections 730 and 952 E [Evidence] Code." Dr. Abe examined defendant and prepared a report which was to go and did go directly to defense counsel. At trial, the defendant called Dr. Abe to the stand. After

---

[3]Evidently a regular procedure at such centers.

[4]Apparently some additional "notes" were furnished by relatives.

[5]In rebuttal, but, without objection, out of order, during defendant's case, immediately after Dr. Abe.

counsel put a preliminary question about defendant's possible dependence on alcohol and drugs, the deputy district attorney pointed out that the doctor was referring to a report and asked to take him on *voir dire,* indicating his intention to establish this reference, and, then, his desire to examine the report on the basis that it had lost its confidentiality. The trial court felt that, although the doctor was refreshing his memory from the report, he was not relying on it and that it was confidential. It observed that the prosecution's right to review the report would be at the time of cross-examination and not on *voir dire,* and it disallowed the prosecution's request.

In further examination by defense counsel, Dr. Abe expressed the opinion that defendant appeared to have a primary dependence upon alcohol and a secondary dependence on seconal; that because of the consumption of alcohol, defendant, at the time of the homicide, did not have the mental capacity to reflect meaningfully and maturely upon the gravity of his act, or to premeditate, deliberate, harbor malice, or form specific intent.

At the outset of his cross-examination, the doctor conceded that he had refreshed his recollection from the report prior to testifying. The deputy district attorney again requested to see a copy of the report. Defense counsel objected, citing Evidence Code section 952 (attorney-client privilege). The trial court felt that the attorney-client privilege was not relevant, observing, in effect, that there was another, more pertinent, code section which was applicable. Dr. Abe mentioned Evidence Code section 1017, relative to psychotherapists, as probably that one. Thereupon, the trial court authorized the prosecution to examine the report.

In the cross-examination which followed a 15-minute recess to allow the deputy district attorney to peruse the report, Dr. Abe conceded that his diagnosis was dependent upon defendant's honest cooperation; that if defendant had lied, he (Dr. Abe) could not have had the opinion he had expressed; that if defendant had told the police that Gloria was in the bed when he awoke (rather than on the floor) it would indicate possible fabrication; that some of the notes which defendant had left might indicate that he had been trying to fabricate a defense; that it was strange that there was no container for alcoholic beverage in the motel room. Dr. Abe granted that the accused was defensive, and further observed that if he had been out-and-out lying during the examination, defendant would have to be considered as having known what had gone on at the time of the homicide; that the degree of his lying would have a bearing; that it was his (Dr. Abe's) perception that defendant was sincere in his love for Gloria; that, how-

ever, defendant could have subconsciously strengthened his love for Gloria after her death; that protestations of affection ahead of time possibly could have been for effect; that if defendant had made an attempt or gesture at suicide, it would mean depression, either because he had lost someone he loved or because he had guilt feelings over what he had done; that the transcript of the preliminary hearing showed that there had been fights and arguments between Gloria and defendant before.

The jurors commenced deliberations on August 12 at 2:30 p.m., after hearing the instructions of the trial court. They had the written instructions with them in the jury room. They brought in a verdict at 9:40 on the 14th. On the second day of deliberations they came back into court and asked to be reinstructed on the definition of diminished capacity and to have read to them all of the testimony of defendant concerning consumption of alcohol and pills over the period from February 3 to February 6. The trial court reread two instructions, advised the jurors that references in them to premeditation should be ignored because there was not any evidence of premeditation, and, in response to questions from a couple of jurors, observed that it was up to the jurors "to decide whether a person's mind is in such condition that [he] cannot form an intent." The requested testimony was read intermittently during continued deliberations.[6]

## Contentions of Defendant

Defendant contends that the trial court erred prejudicially in the following respects (presented here in the order of our treatment):

(1) By ruling that no privilege was attached to Dr. Abe's report and that it could be examined by the deputy district attorney prior to his cross-examining the doctor.

(2) By allowing Mrs. Squires (Gloria's mother) to give conclusions regarding Gloria's emotions, particularly that of fear concerning defendant.

(3) By receiving the testimony of prosecution rebuttal witness, Jeanne Lair, regarding fights which Gloria and defendant had in 1968.

(4) By not allowing Mrs. Broussard, of the Shangri Lodge, to testify concerning whether she saw bruises on defendant's face.

(5) By instructing the jury partially on first degree murder despite a conceded absence of evidence of premeditation, a judicial action which had the potential to and did induce the jury to come to a compromise verdict of second degree murder.

---

[6]The total hours of actual deliberation over the three days was seven. An hour and fifty minutes were consumed in the reading from the transcript.

Defendant further contends that there was no basis for a second degree murder verdict; that it was a compromise between manslaughter and first degree murder.

## 1. CONCERNING THE REPORT OF DR. ABE.[7]

With respect to the trial court's authorization to the prosecution to inspect Dr. Abe's report and use it in the course of cross-examination, two rules of evidence are involved. One has to do with when the right accrues to one side of a lawsuit to inspect a writing used by a witness to refresh his memory and then to cross-examine the witness with respect to that writing (Evid. Code, § 771); and the other has to do with the extent to which the lawyer-client privilege (Evid. Code, ch. 4, art. 3, § 950 et seq.)[8] or the psychotherapist-patient privilege (Evid. Code, ch. 4, art. 7, § 1010 et seq.), pertain to such a writing completed by the psychotherapist in his examination of and interview with the patient and so used by the psychotherapist in his testimony.

The second factor certainly seems to be of paramount importance. If a privilege prevails, it would seem that it should override the more mechanical features of section 771.

Obviously, Dr. Abe, a recognized psychiatrist, is a psychotherapist, a person authorized to practice medicine who devotes a substantial portion of his time to the practice of psychiatry (§ 1010); and defendant clearly was a patient, a person who submits to examination by a psychotherapist for the purpose of securing a diagnosis (§ 1011). Under the psychotherapist-patient privilege a confidential communication, of course, includes a diagnosis made in the course of the relationship (§ 1012).

Generally, there is no privilege under article 7 where the psychotherapist is appointed by the court; but this exception does not apply where the appointment is on request of the lawyer for the defendant in a criminal proceeding in order to provide the lawyer with information so that he might advise the defendant whether to present a defense based on his emotional condition. (§ 1017.) Thus, we start out in the instant case with the privilege applicable. However, section 1016 provides that there is no privilege under article 7 as to a communication relevant to an issue concerning the emotional condition of the patient if such issue has been tendered by the patient. The Law Revision Commission comment on sec-

---

[7]Despite our conclusion as to topic 5, we discuss the preceding contentions as a guide to the trial court in case a retrial eventuates.

[8]In this segment of the opinion, section and article references are to the Evidence Code.

tion 1017 indicates that it was intended that section 1016, even though it appears numerically first in the code, be the more fundamental section and set the basis for the termination of any privilege arising under the latter part of section 1017. Even section 1017 in its own wording suggests a limitation of the privilege to the "advice area." The following is a portion of the section 1017 comment: "[W]hen the psychotherapist is appointed by the court, it is most often for the purpose of having the psychotherapist testify concerning his conclusions as to the patient's condition. It would be inappropriate to have the privilege apply in this situation. . . . On the other hand, it is essential that the privilege apply where the psychotherapist is appointed by order of the court to provide the defendant's lawyer with information needed so that he may advise the defendant whether . . . to present a defense based on his . . . emotional condition. If the defendant determines not to tender the issue of his . . . emotional condition, the privilege will protect the confidentiality of the communication. . . . If, however, the defendant determines to tender this issue— . . . by presenting a defense based on his . . . emotional condition . . . —the [exception] provided in [section] 1016 [makes] the privilege unavailable to prevent disclosure of the communications between the defendant and the psychotherapist."

In the situation where a defendant, who is in a psychotherapist-patient relationship, withdraws a plea of insanity prior to trial, the commentators (in a 1967 amendment to the section 1017 comment) point out that "since the defendant does not tender an issue based on his . . . emotional condition at the trial, the privilege should remain applicable. Of course, if the defendant determines to go to trial on the plea based on insanity, the psychotherapist-patient privilege will not be applicable. See section 1016."

However, at the close of the 1967 amendment, the commission cautions that "[i]t is important to recognize that the attorney-client privilege may provide protection in some cases where an exception to the psychotherapist-patient privilege is applicable." Thus, it is important to examine the article (ch. 4, art. 3, § 950 et seq.) covering that privilege and section 912, subdivision (d) of the general provisions of chapter 3. The latter section provides: "A disclosure in confidence of a communication that is protected by a privilege provided by section 954 (lawyer-client privilege) . . . , when such disclosure is reasonably necessary for the accomplishment of the purpose for which the lawyer . . . was consulted, is not a waiver of the privilege." Essentially, this provision is to cover the situation wherein the lawyer discloses confidences he has received from his client to the psychotherapist. However, some of the comments of the Law Revision Commission to section 912 shed light on the instant problem. One

reads as follows: "Subdivision (d) is designed to maintain the confidentiality of communications in certain situations where the communications are disclosed to others in the course of accomplishing the purpose for which the lawyer . . . was consulted." The comment then gives an example where the confidence receiver is a psychotherapist: "Nor would a . . . psychotherapist's keeping of confidential records necessary to diagnose . . . a patient, such as confidential hospital records, be a waiver of the privilege, even though other authorized persons have access to the records. . . . Communications such as these, when made in confidence, should not operate to destroy the privilege even when they are made with the consent of the client or patient."

Section 952 in chapter 4, article 3, provides that " 'confidential communication between client and lawyer' means information transmitted between a client and his lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than . . . those to whom disclosure is reasonably necessary for the . . . accomplishment of the purpose for which the lawyer is consulted." The comment points out that "[a] lawyer at times may desire to have a client reveal information to an expert consultant [e.g., to a psychotherapist appointed by the court to advise on diminished capacity defense; see section 1017] in order that the lawyer may adequately advise his client. The inclusion of the words 'or the accomplishment of the purpose for which the lawyer is consulted' assures that these communications, too, are within the scope of the privilege. This part of the definition may change existing law. Himmelfarb v. United States, 175 F.2d 924 . . . applying California law, held that the presence of an accountant during a lawyer-client consultation destroyed the privilege, but no California case directly in point has been found. Of course, if the expert consultant is acting merely as a conduit for communications from the client to the attorney, the doctrine of City & County of San Francisco v. Superior Court [37 Cal.2d 227, 234-235 (231 P.2d 26)] applies and the communication would be privileged under existing law as well as under this section."

Article 3, on attorney-client privilege, does not reveal a situation, suggested as possibly present in the comment to section 1017, where this privilege affords protection even though the psychotherapist-patient privilege is no longer applicable. Perhaps it is intended that protection still should be afforded. However, the various Law Revision Commission comments above excerpted indicate that the attorney-client privilege pertinent to the client's revelations to the psychotherapist and the latter's diagnosis which is passed on to the lawyer so that he can advise his client on whether to

present a defense based on emotional status goes only to the advice area and ends if the client and his lawyer go beyond that stage and decide to present the defense.

There should have been no reluctance on the part of defendant to talk to Dr. Abe in confidence for fear that what he said would be revealed in court, because it would not be unless he, himself, chose to make his emotional condition an issue.

Thus, we feel that no privilege applied, the provisions of section 771 relative to the production of a writing used to refresh memory could be put into effect, and that the trial court's ruling was correct.

## 2. CONCERNING TESTIMONY OF MRS. SQUIRES; EVIDENCE OF FEAR.

The testimony of Gloria's mother, Mrs. Squires, indicating that Gloria was in a state of fear as to defendant because he was in a highly emotional state was relevant to the conflict between opposingly claimed inferences on the issue of whether a situation of love and trust or one of animosity and distrust between Gloria and defendant was dominant at the time of the homicide. A current feeling of fear on the part of Gloria would have pointed toward the latter. The existence of a condition of animosity and distrust would have made it less likely that defendant could have been emotionally incapable of intentionally killing Gloria or performing against her, with a base motive and disregard for the likely fatal consequences, an act which had a high probability of causing death. The possibility no doubt existed that it would be difficult for the jurors to carry out a trial court instruction to separate in their minds any recitals of the witness about hearsay exclamations or conduct of defendant from an abstract state of fear in the victim. This, then, presented a decision for the trial court, under Evidence Code section 352, whether the probative value of such testimony in the permissible area outweighed the probability of it causing undue prejudice to defendant. In handling this task, the trial court might well have taken into consideration the fact that from one viewpoint the evidence was advantageous to defendant. It indicated a high emotional state in him which would make him easily aroused to the heat of passion or put him in a mood to engage in sudden argument or to partake of capacity diminishing ingredients such as alcohol or dangerous drugs. Moreover, there was very little related by Mrs. Squires with respect to actions or words on the part of defendant. Finally, although part of her discourse might have been hearsay, some was strictly recounting her discernment of a state of fear in Gloria derived from tone of voice and psychological reactions. We cannot say as a matter of law that the trial court abused its discretion.

### 3. Concerning the Testimony of Mrs. Lair.

█ With respect to the testimony of Mrs. Lair, received in rebuttal, we first observe that it may have given defendant more concern than it might have otherwise because of the fact that it came in out of order, while he was still putting on his defense. Of course, this was with his consent. However, it clearly was in rebuttal of the defense concept that a state of mind necessary for second degree murder, either with express or implied malice, and even for manslaughter, was not consistent with the loving relationship which defendant contended existed between him and Gloria. As indicated in connection with other contentions which involve the receipt or exclusion of evidence indicative of some periods of argumentative stress between Gloria and defendant, the evidence was two-edged, and defendant, himself, got into an inconsistent position in his requests for rulings. Perhaps even the trial court was inconsistent to a degree, but certainly not to the extent where any prejudice was created, if there had been no errors in the instructions.

### 4. Concerning the Proposed Testimony of Mrs. Broussard.

█ Presumably, defendant was desirous of showing that on the fatal night both he and Gloria had shed blood in a mutual affray wherein the resulting death of Gloria was more likely manslaughter than second degree murder.

The proposed testimony of Mrs. Broussard seems relevant in that it showed that Gloria and defendant were prone to occasional physical conflicts which could involve bloodletting on the part of defendant, giving some justification to the inference that such an affray might have occurred on the date of the homicide. Nevertheless, it was remote enough to fall within the discretionary province of the trial court permitting exclusion of it for reasons of trial economy. However, there is an intimation that the trial court felt that this evidence was irrelevant and ruled on that basis rather than on a section 352 evaluation. If there is a retrial, the trial court should make such an evaluation. In this respect it should be noted that this evidence equates with the testimony of Mrs. Lair which came in as rebuttal to defendant's showing of a state of affection between himself and Gloria. It would seem that if one were to be in the other should be also. It is noteworthy that defendant sought to have one of the previous altercations excluded. Thus, in one sense, the testimony which Mrs. Broussard was going to give could have been harmful as well as helpful to defendant. Moreover, the possibility of some of defendant's blood being present in the motel room was not too significant because the blood at the more important locations

was typed and found to be that of Gloria. In addition, the material was cumulative. Other witnesses testified as to altercations occurring between Gloria and defendant, one of which caused some injury to defendant. Also, defendant testified concerning an occasion when he cut his finger and another occasion when he was struck in the head with an object thrown by Gloria. In final consideration, however, it does seem that the elimination of one example of volatile conduct between defendant and Gloria, albeit one of double implication, from the argument we presume his counsel made to the jurors that they should return no more than a manslaughter verdict could have been more serious than it otherwise would have been, in face of the instruction errors we now discuss.

## 5. CONCERNING INSTRUCTIONS

Defendant urges, in effect, that such references as there were to first degree murder in the set of instructions given by the trial court at least suggested to the jury that one verdict open to them was first degree murder, that this intimation really was not cured by the delayed informal observation of the trial court to the jury that there was no indication in the evidence of premeditation, and that it influenced the jury to the extent of causing it to bring in a compromise verdict of second degree murder when the factors supportive of that verdict were not as strong as those supportive of a verdict of manslaughter or of not guilty on the basis of excusable homicide. In his supplemental brief, defendant urges that this irregularity was compounded by an inappropriate instruction relating to second degree murder. He urges that the closing subordinate phrase in the instruction, as given, involving absence of intent, is even more defective than a similarly placed subordinate phrase involving felony murder which was strongly condemned in *People v. Cobas,* 12 Cal.App.3d 952 [91 Cal.Rptr. 110].

With respect to the first complaint, defendant has not been explicit in his contention. However, we have searched the instructions and believe we have located those which have a reference to or an inference about first degree murder. We presume that these are the ones that defendant has in mind.

The first is CALJIC 305B.[9] It was requested by defendant. In part it states to the jurors, in effect, that if you find defendant guilty of murder, before you render a verdict, you must agree unanimously on the degree. This suggested that a verdict of either first or second degree murder was

---

[9]Unless otherwise specified, all CALJIC references are to the 1958 Revised Edition. See footnote 13 for comment concerning failure to instruct on a point which well could have been included in this one.

open to the jury. There is no evidence of substance in the record to support a theory of first degree murder. The trial court noted this. Apparently the prosecutor did not try or argue the case on such a theory, although he offered an instruction, which was rejected, saying that it was the duty of the jury, if it found defendant guilty of murder, to state in its verdict whether it was of the first or second degree. Under the circumstances, it would have been better for the trial court to have formulated an instruction which said to the jurors, in effect: If you should find defendant guilty of murder in this case, it would be murder of the second degree.[10] The trial court's refusal of the instruction calling for the jury to state the degree of murder in its verdict, its apparent elimination from the so-called *Conley* instruction, discussed hereinafter, of a specific explanation that first degree murder should be the verdict if premeditation were found, and its oral observation that there was no evidence of premeditation indicates that it was making some effort to avoid indicating that first degree murder could be a verdict of the jury. However, it was only references to premeditation in the instruction reread to the jury (305.1 (New) and the *Conley* instruction) on the second day of deliberations which the trial court told the jury to ignore. Literally, it did not give such a caution as to this instruction. (CALJIC 305B.) The oral admonition coming as it did tangentially on the second day and not being part of the written instructions formally read to the jury and with them in the deliberation room may not have made as strong an impression on the jurors as the latter. Considering these countervailing aspects, we feel that the language used was somewhat confusing and misleading.

A second instruction in this category, not requested by defendant, is CALJIC 305.1 (New) dealing with reduced mental capacity. In part, this instruction said to the jurors, in effect, that if you find defendant's mental capacity so diminished that (1) you have a reasonable doubt that he premeditated, then you cannot find him guilty of first degree murder; or (2) you have a reasonable doubt that he harbored malice aforethought, then you cannot find him guilty of first or second degree murder. This instruction also suggests that first degree murder was a possible verdict. Although, separately, again, the confusion injected is not serious, cumulatively there is a compounding effect.[11]

The third instruction in this category was prepared by defendant and based on an instruction recommended in *People v. Conley,* 64 Cal.2d 310,

---

[10]Other parts of this instruction as given were applicable to the jury's choice between murder and manslaughter, so it was not entirely inappropriate.

[11]Other wording in this instruction provided the criteria under which the jury should not find defendant guilty of any kind of murder; so this much was beneficial to defendant and appropriate.

324-326, footnote 4 [49 Cal.Rptr. 815, 411 P.2d 911]. It also was requested by defendant and told the jurors, in part, in substance: If you find that defendant killed while conscious, with malice, you will return a verdict of murder; [see later comment for apparent trial court omission here] if you find that defendant's capacity was so diminished that "you have a reasonable doubt whether defendant premeditated . . . you will find defendant guilty of murder in the second degree." This instruction, of course, suggests in a way that first degree murder was a potential finding available to the trier of fact if not eliminated by diminished capacity.[12] Defendant's *Conley* instruction also says that premeditation must be present in first degree murder and that malice is essential for either degree of murder, once again calling the jury's attention to first degree murder. But, obviously, a certain amount must be said about first degree murder in order to make clear what second degree murder is. The best procedure is to so advise the jury in cases like the instant one.

A part of the instruction as it is set out in the clerk's transcript was enclosed in brackets. It appears at the place indicated by our bracketed remark in our paraphrasing. It said that if the jury found that the murder was premeditated it should "find the murder to be of the first degree." We assume that the trial court did the bracketing and did not read that part so as not to make an explicit direction to the jury for the return of a first degree murder verdict. However, the instruction as read added one further increment to the forming element which possibly could have motivated at least a compromise approach.

Although the instructions mentioned firstly and thirdly above were re-

---

[12]The latter part of this segment of the instruction must be labeled at least an incongruity. By reason of the wording shown not included by the omission sign in the above quotation, it can be read as stating that if you find defendant's capacity so diminished that you have a reasonable doubt whether he formed an intent to kill, you will find him guilty of second degree murder. This is unfortunately phrased as far as defendant is concerned. Removal of intent to kill actually eliminates one basis for second degree murder——express malice, although it would be true that a capacity diminished just to that extent and not to the point of raising a reasonable doubt of a state of mind requisite for implied malice would still allow a conviction of second degree murder under that concept. (The instruction does go on to explicate manslaughter.) However it is possible that because the intent-to-kill phraseology appears as the last part of a series the forerunning parts of which were deliberation and premeditation, the drafter was not using the phrase "intent to kill" as being descriptive of express malice. This partial instruction contrasts with two others unfortunately phrased as far as the prosecution is concerned, CALJIC 27A (New) (jury may not find defendant guilty of offense *charged* [meaning, apparently, only as in the information-murder] unless circumstances not only are consistent with a specific intent to kill but are irreconcilable with any other rational conclusion); and CALJIC 71.11 (New) (in the crime charged [again, apparently, by the information-murder] there must be joint operation of conduct and specific intent; in murder, there must be the specific intent to kill). These instructions did not allow for the nonintent-to-kill type of second degree murder produced by implied malice and were inconsistent with other more accurately phrased instructions.

quested by defendant, there was no invited error, since defendant's request appears to have resulted from neglect or mistake rather than from a tactical purpose (see *People* v. *Graham,* 71 Cal.2d 303, 319 [78 Cal.Rptr. 217, 455 P.2d 153]).

The instruction involved in the second facet of defendant's attack, a revamped version of CALJIC 305 (Rev.), in substance, states, in part, that the definition of second degree murder, in practical application, means that such a murder occurs (1) when there is an intention to unlawfully kill but no premeditation, or (2) when killing results from an act involving a high probability that death will result, done with a base motive and wanton disregard for human life, *even if the defendant did not intend that his act would result in death.* Defendant thinks that the gist of the emphasized paraphrasing is more erroneous than the import of the phrase condemned in *People* v. *Cobas, supra,* 12 Cal.App.3d 952, which the trial court took the pains to eliminate from this instruction. In essence, the instruction involved in *Cobas* (which apparently was CALJIC 305 (Rev.)) stated that in a murder where the malice is "implied," the killing is a result of (1) an act involving a high probability that death will result done with a base motive and wanton disregard for human life or (2) *the perpetration of a felony inherently dangerous to human life.* (Note that the circumstance specified in the italicized phrase is an alternative for the situation typically producing implied malice.) Defendant must misconstrue both the grammatical and substantive aspect of the phrase he attacks. Obviously, it is not an independent clause presenting an alternative to the preceding description of the situation producing implied malice, but it is simply part of an attempted explanation of the point of law that the combination of factors which are productive of the concept of implied malice are the equivalent of an actual intent to kill which is productive of the concept of express malice.

A greater problem, one that this court pointed out to the parties at oral argument, is that the instruction which preceded the one just considered, and of which it is quite duplicative, CALJIC 301 (Rev.), did not have the objectionable *Cobas*-condemned phrase stricken out. That instruction stated that one situation wherein malice is implied is when the killing is a direct causal result of the perpetration of a felony inherently dangerous to human life. Defendant himself requested the instruction, perhaps without realizing that it contained the objectionable phrase. That it was given inadvertently is indicated by the fact that the trial court took the pains to eliminate the suspect phrase from the other instruction and that all of the other instructions were couched in a manner which anticipated a premise devoid of such a concept. However, the instant case differs from *People* v. *Cobas, supra,* 12 Cal.App.3d 952 and *People* v. *Ireland,* 70 Cal.2d 522,

538-539 [75 Cal.Rptr. 188, 450 P.2d 580], in that no felony was defined in the instructions. Moreover, the prosecution did not press any felony-murder theory. Nonetheless, there is more cumulation or at least confusion for the jury.

 Another instructional problem raised by this court at oral argument[13] was the failure of the trial court to instruct the jurors that if they had a reasonable doubt whether the offense was manslaughter or murder in the second degree their verdict should be for manslaughter. (CALJIC 305 AA (New).) Such an instruction was not requested by defendant.

We feel that an instruction of this nature should have been given by the trial court *sua sponte*. Section 1097 of the Penal Code reads: "When it appears that the defendant has committed a public offense, and there is reasonable ground of doubt in which of two or more degrees he is guilty, he can be convicted of the lowest of such degrees only." In *People* v. *Dewberry*, 51 Cal.2d 548, 554-558 [334 P.2d 852], the Supreme Court (in holding that such an instruction should have been given) ruled that the reference to degrees of crime in Penal Code section 1097 referred to all degrees of criminality, and that anyway decisional law required the giving of such an instruction, especially when an instruction had been given relative to doubt between degrees of murder and between manslaughter and justifiable homicide.

Section 502 of the Evidence Code provides that the trial court "shall" instruct the jury whether the burden of proof a party has "requires that . . . he establish the existence or nonexistence of a fact by a preponderance of the evidence, by clear and convincing proof, or by proof beyond a reasonable doubt." (See also *People* v. *Soldavini*, 45 Cal.App.2d 460, 463-464 [114 P.2d 415], and Appendix A, CALJIC (3d ed.), comprised of an article, "Criminal Law—Sua Sponte Instructions" by Philip H. Richards, judge of the superior court (retired) p. 578.) Penal Code section 1096, of course, contains the classic burden of proof definition that "in case of a reasonable doubt whether [a defendant's] guilt is satisfactorily shown, he is entitled to an acquittal, . . . [placing] upon the state the burden of proving him guilty beyond a reasonable doubt." ("Reasonable doubt" is then defined.)

The effect of *Dewberry, supra,* appears to be the establishment of the principle that Penal Code sections 1906 and 1907, together, constitute

---

[13]We also pointed out that there was no instruction given or requested that there must be unanimous agreement as to either second degree murder or manslaughter. Defendant has not cited, and we have not found, any precedent for the proposition that such an instruction must be given *sua sponte*. The jurors were instructed that "[i]n order to return a verdict it is necessary that all twelve of the jurors agree to the decision." The deficiency is minor, but is one more item in the accumulation of problems.

the statutory definition of reasonable doubt in cases which involve a choice between statutory degrees of a stated crime and those which involve a choice between a principle and a lesser included offense. It is to be noted that an instruction of this type was given in the case of *People* v. *Mosher*, 1 Cal.3d 379 [82 Cal.Rptr. 379, 461 P.2d 659], as pointed out by the dissent therein at page 401. It is not disclosed if this was *sua sponte*. In *Dewberry*, *supra*, the defendant offered such an instruction, so the Supreme Court did not have to make an express determination that such an instruction was in the *sua sponte* classification. However, the high court employed language which, viewed in the light of the precepts of another of its decisions indicates that. Its words were that the proposed instruction "went directly to the defense of reasonable doubt of defendant's guilt of second degree murder; it was clearly responsive to an issue raised by the evidence." (P. 557.) "No principle of law is better recognized than the rule that in a criminal case the court must, even without request, instruct the jury on all general principles of law pertinent to the issues raised by the evidence. [Citation.] The 'general principles of law governing the case' are 'those principles of law commonly or closely and openly connected with the facts of the case before the court.' [Citations.] However incredible a defendant's testimony, he is nevertheless entitled to an instruction based on the hypothesis that it is entirely true, and it is prejudicial error to withdraw from the jury consideration of such evidence. [Citation.]" (*People* v. *Coleman*, 8 Cal.App.3d 722, 732-733 [87 Cal.Rptr. 554].)

Footnote 9 in *Coleman*, *supra*, calls attention to the fact that an instruction of this type was omitted in the charge to the jury. The indication is that it was called for *sua sponte*. However, the court also states, quoting in part from *People* v. *Chapman*, 261 Cal.App.2d 149, 174 [67 Cal.Rptr. 601]: "We have had occasion to observe that 'overbroad appellate demands for *sua sponte* instructions tend to hamper the tactical choices of defense attorneys and put trial judges under pressure to glean legal theories and winnow the evidence for remotely tenable and sophistical instructions. They also supply defense counsel an opportunity to capitalize on invited error by failing to request an instruction thinly supported by meager evidence, then utilizing its absence as an argument for appellate reversal.'" (Pp. 733-734.) However, Judge Richards, in his article on *sua sponte* instructions, *supra*, at pages 585-586, lists the instruction to be given as to a reasonable doubt between degrees of a crime or between a principal and lesser included offense as a *sua sponte* one.

We feel that the salutary approach is to establish the decisonal rule that the instruction is one which the trial court should give *sua sponte* in lesser included offense cases.

It appears that the giving of such an instruction in the instant case would have been significant. The jurors were out deliberating parts of three days; they requested to be reinstructed on the doctrine of diminished capacity and asked specific questions about it; they desired to hear again defendant's testimony concerning the consumption of alcohol and pills. So, the jurors obviously were concerned with the possibility that defendant's mental ability to harbor malice had been diminished by taking intoxicating liquor and pills. Thus, an instruction on deferring to manslaughter, when there was a reasonable doubt as between second degree murder and it, may have been crucial, even though the jurors had been instructed on reasonable doubt as to the effect of diminished capacity.[14]

■ The cumulative effect of all of the errors hereinabove discussed was, we feel, prejudicial to defendant. It is reasonably probable that the jury would not have brought in its second degree murder verdict if there had been no omissions and errors in the instructions regarding the subject of murder and manslaughter. (See *People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243].) A verdict of one type or the other of manslaughter would have been justified under the evidence.

However, this is not a case where there is not sufficient evidence to support a verdict of second degree murder had there been no error in the instructions. Therefore, it should be open to the prosecution, if it so desires, to retry that charge. (See *In re Morse*, 70 Cal.2d 702, 710 [76 Cal. Rptr. 385, 452 P.2d 601]; *People* v. *Thomas*, 25 Cal.2d 880, 904-905 [156 P.2d 7]; *People* v. *Shavers*, 269 Cal.App.2d 886, 889-890 [75 Cal. Rptr. 334].) The picture which developed was one of two emotional people who did have a great deal of affection for each other, but, nonetheless, had periods of antagonism and conflict. If one of the latter periods prevailed, the soil, fertile for the production of malice, was present. The question of whether, under these circumstances, the homicide was in the category of second degree murder or in that of manslaughter was for the jurors, and would be again. Much of what presented the problem of choice between second degree murder and manslaughter is reflected in the thought-notes written by defendant which were received in evidence. Either alternative can be drawn from them, as intimated by Dr. Abe. They set up a typical jury task. (We are setting most of them out in an appendix. However, although we make our collation of these notes a part of the official opinion

---

[14]As part of CALJIC 305.1 (New), the jurors were instructed that if there was a reasonable doubt whether the defendant did harbor malice, they could not find him guilty of either first or second degree murder; and in the *Conley* instruction they were instructed that malice was essential for either degree of murder, and so if they had a reasonable doubt whether there was malice, they could find defendant guilty of no higher offense than manslaughter.

on file, due to the intimate nature of these revelations and out of deference to defendant and his family and the family of Gloria, we direct that they not be printed as part of the publication of this decision.[15])

There is no reason why this case should be tried again if the People would be satisfied with an adjudication of manslaughter. The major errors bear only upon the subjects of murder and manslaughter and go only to the question of the choice between those crimes. In no way could they have caused any confusion about the alternative of justifiable homicide. There is ample evidence by way of physical indication of culpability and consciousness of guilt to support an adjudication of manslaughter.

A manslaughter verdict could have been of either the voluntary or involuntary type. Under these circumstances, any reduction would have to be to involuntary manslaughter, the less serious of the two types.

To enable the People to determine if they wished to request a reduction we issued this opinion on August 20, 1971, with a concluding paragraph advising that if the People filed a writing within seven days requesting a reduction of the judgment, we would effect it and affirm the judgment as so modified, citing *People* v. *Shavers, supra,* 269 Cal.App.2d 886, 889-890 and *People* v. *Heslen,* 27 Cal.2d 520, 521 [165 P.2d 250]. Otherwise, the judgment was to stand reversed. On August 24, 1971, the Attorney General, after consultation with the district attorney, transmitted a letter to this court requesting that the judgment be reduced to involuntary manslaughter. We therefore, by means of a modification of opinion, have caused the removal of the referenced paragraph and now conclude our opinion as follows:

The judgment of the trial court of second degree murder is modified to involuntary manslaughter, and as so modified the judgment is affirmed. The cause is remanded to the trial court with directions to enter judgment against defendant finding him guilty of involuntary manslaughter and thereupon to pronounce judgment upon him as prescribed by law. (See *People* v. *Bridgehouse,* 47 Cal.2d 406, 414 [303 P.2d 1018].)

Stephens, Acting P. J., and Aiso, J., concurred.

---

[15]We feel that publication of this opinion is warranted in light of our position that the instruction based on Penal Code section 1097 and *People* v. *Dewberry, supra,* 51 Cal.2d 548, should be given *sua sponte.*

## APPENDIX

**Editorial Note:**

Pursuant to the direction of the court, at pages 705-706, the 3-page appendix to the foregoing opinion has not been printed.