[Crim. No. 8662. Fourth Dist., Div. One. Apr. 3, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
COLLEEN SHOCKLEY, Defendant and Appellant.

## COUNSEL

Appellate Defenders, Inc., under appointment by the Court of Appeal, and Barry D. Utsinger, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, *Chief Assistant Attorney General,* Daniel J. Kremer, *Assistant Attorney General,* Alan S. Meth and Patricia D. Benke, *Deputy Attorneys General,* for Plaintiff and Respondent.

## OPINION

**COLOGNE, J.**—Colleen Shockley was charged with murder of her son James on April 13, 1974 (count one; Pen. Code, § 187), willful cruelty toward and endangering her sons James and Timothy on April 13, 1974 (counts two and three; Pen. Code, § 273a, subd. (1)), willful cruelty toward and endangering Timothy between August 1, 1975 and November 18, 1975 (count four; Pen. Code, § 273a, subd. (1)), and inflicting cruel and inhuman corporal punishment on Timothy between August 1, 1975 and November 18, 1975 (count five; Pen. Code, § 273d). The court granted the motion to sever counts four and five which dealt with Timothy alone and occurred over a year later. After trial without jury Colleen was found guilty of second degree murder (count one) and willful cruelty and endangering her sons (counts two and three). On motion of the People the other charges were dismissed.

Colleen was sentenced to prison for the term prescribed by law, sentences to run concurrently. Colleen appeals.

James and Timothy were twins, born July 11, 1972, of Carl and Colleen Shockley. Colleen had another child, Tony Camps, issue of a previous marriage.

On April 13, 1974, when the twins were 21 months old Carl left for work about 6 a.m. and came home about noon. He looked in on the children and found James was dead. He called the police and awakened Colleen. He told her James was dead and said "he looks as if he's been strangled." When the police arrived about 15-20 minutes later they found the room filthy, as was the rest of the house except Tony's room. The twins room smelled of urine and feces. James' pants were soaked with urine and there was fecal matter on one of his legs and on the bed. The right and left sides of his face showed several recent bruises. There was blood under his upper lip and a small laceration below his right ear. The coroner fixed the time of death at between 6:30 and 8:30 a.m. and entered the cause of death as edema and hemorrhage, pulmonary bilateral (etiology undeterminable); other significant conditions, malnutrition and dehydration. He did not mention suffocation and in

announcing its findings at the end of trial the court specifically ruled the death was not caused by suffocation or the inordinate discipline practiced by the parents. The court stated the cause of death was malnutrition and dehydration.

It was evident James was in a weakened condition before his death. A week before his death, James was too weak to crawl.

Timothy was taken to the hospital suffering from malnutrition and dehydration. His body had numerous minor bruises and scratches in various stages of healing. None of these injuries was caused accidentally. His condition was grave and was described as a classic case of deprivation. He would have died too if his condition had been allowed to continue.

Timothy responded to care extremely well, ate well and gained weight rapidly. He was walking in six weeks.

Timothy and Tony were placed in a foster home.

Colleen had disciplined the children most severely and on one occasion Carl had to forcefully restrain her from hurting the children. The Shockleys fit the typical medical profile of battering parents with financial and marital difficulties and severe discipline of the children. Carl testified that during the last month before James' death food which had been purchased for the children was never prepared or served and remained on the shelf.

■ Colleen contends the felony-murder rule was improperly invoked because the underlying felony is child abuse which is necessarily included within the offense of murder. Relying on the rule announced in *People* v. *Ireland,* 70 Cal.2d 522, 538-540 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323], she contends the offense cannot support the felony-murder rule.

■ In *People* v. *Ireland, supra,* 70 Cal.2d 522, 538-539, the Supreme Court said:

"The felony-murder rule operates (1) to posit the existence of malice aforethought in homicides which are the direct causal result of the perpetration or attempted perpetration of *all* felonies inherently dangerous to human life, and (2) to posit the existence of malice aforethought

*and* to classify the offense as murder of the first degree in homicides which are the direct causal result of those six felonies specifically enumerated in section 189 of the Penal Code. [Citations.] Thus, 'A homicide that is a direct causal result of the commission of a felony inherently dangerous to human life (other than the six felonies enumerated in Pen. Code, § 189) constitutes at least second degree murder.' [Citation.] Accordingly, the giving of a second degree felony-murder instruction in a murder prosecution has the effect of 'reliev[ing] the jury of the necessity of finding one of the elements of the crime of murder' [citation] to wit, malice aforethought.

"    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"This instruction might have been understood by the jury in either of two ways. First, the jury might have concluded therefrom that it should find defendant guilty of second degree murder if it *first* found that defendant harbored malice aforethought and *then* found that the homicide had occurred in the perpetration of the crime of assault with a deadly weapon. If the jury had understood the instruction in this way it would have misconceived the doctrine of second degree felony murder as we have explained it above. Second, if the jury derived from the instruction the correct meaning of the doctrine in question, it would have concluded that it should find defendant guilty of second degree murder if it found only that the homicide was committed in the perpetration of the crime of assault with a deadly weapon. This, the proper understanding of the instruction [citation], would have relieved the jury from a specific finding of malice aforethought.

". . . . This kind of bootstrapping finds support neither in logic nor in law. We therefore hold that a second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included *in fact* within the offense charged."

■    Our courts have consistently held that where the underlying offense is assault with a deadly weapon the felony-murder rule is improper (*People* v. *Burton,* 6 Cal.3d 375, 385 [99 Cal.Rptr. 1, 491 P.2d 793]). In *People* v. *Wilson,* 1 Cal.3d 431 [82 Cal.Rptr. 494, 462 P.2d 22] the court was presented with burglary where the intended felony was assault with a deadly weapon and the court held the felony-murder rule

would not apply.[1] Thus, even though burglary is one of the felonies specifically enumerated in Penal Code section 189, the courts have declined to allow the felony-murder instruction when the intended assault was with a deadly weapon (*People* v. *Wilson, supra,* at p. 441).

■    Where the underlying felony is based on an independent felony not related to the assault causing the murder, a different result follows. An armed robbery, for example, has as its primary purpose the acquiring of money or property and thus the felony-murder rule would apply (*People* v. *Burton, supra,* 6 Cal.3d 375, 387). The purpose of the felony-murder rule is to deter felons from killing negligently or accidentally by holding them strictly responsible for the killing they commit (*People* v. *Washington,* 62 Cal.2d 777, 781 [44 Cal.Rptr. 442, 402 P.2d 130]). So, too, in *People* v. *Taylor,* 11 Cal.App.3d 57 [89 Cal.Rptr. 697], the court held the felony-murder instruction was properly given when the underlying felony was the furnishing of heroin. The court concluded the felony had a "collateral and independent felonious design" (*People* v. *Taylor, supra,* 11 Cal.App.3d 57, 63). In other words the felony was not done with intent to commit an injury which would cause death. The Supreme Court in *People* v. *Mattison,* 4 Cal.3d 177 [93 Cal.Rptr. 185, 481 P.2d 193] went further to hold the second degree felony-murder instruction was properly given when the underlying felony was poisoning a food, drink or medicine with intent to injure (Pen. Code, § 347). The court in *Mattison, supra,* at page 185, pointed out administering poison was indistinguishable from administering heroin and quoted that portion of *Taylor* which said, " '[w]hile the felony-murder rule can hardly be much of a deterrent to a defendant who has decided to assault his victim with a deadly weapon, it seems obvious that in the situation presented in the case at bar [poisoning], it does serve a rational purpose: knowledge that the death of a person to whom heroin [poison] is furnished may result in a conviction for murder should have some effect on the defendant's readiness to do the furnishing.' "

■    Here the propriety of using the felony-murder rule is even more justified. The underlying felony here is occasioned when, under circumstances or conditions likely to produce great bodily harm or death, the

---

[1]Cf. *People* v. *Sears,* 2 Cal.3d 180, 188-189 [84 Cal.Rptr. 711, 465 P.2d 847], where the court held the offense of burglary with intent to assault *another* was not an offense which would bar a felony-murder instruction under *Ireland* and *Wilson.* Applying the doctrine of transferred intent, however, the court found support for the principle expressed in *Ireland* and held it was inappropriate to instruct on felony-murder.

person having the care or custody of any child willfully causes or permits the child to be placed in such a situation that its person or health is endangered (Pen. Code, § 273a, subd. (1)). The act of leaving the child in a position that endangers its person or health is clearly collateral and independent of any design to cause death. The act may be based on indifference or neglect or simply failure to take time to properly look after the child. We find this properly within the purpose of the legislative effort to deter the felonious conduct which may result in death. The felony-murder rule properly applies.

■ Colleen next contends she was denied due process because of the preindictment delay.

A summary of the procedural events leading up to indictment is appropriate.

April 16, 1974—Complaint filed charging two counts of willful cruelty toward her sons (Pen. Code, § 273a, subd. (1)) and two counts of inflicting cruel and inhuman corporal punishment (Pen. Code, § 273d) for events of April 13, 1974 (No. C-80149).

May 16, 1974—The preliminary hearing held and all charges were dismissed for lack of evidence.

June 26, 1974—Juvenile hearing and Timothy removed from his mother's custody.

August 1, 1975—Timothy returned to his mother.

November 20, 1975—New petition filed in juvenile court on behalf of Timothy.

December 15, 1975—Timothy ordered to be placed in a foster home.

December 19, 1975—Felony complaint lodged for child abuse of Timothy between September 1, 1975, and November 18, 1975 (No. C-95250).

December 23, 1975—Arraigned.

February 25, 1976—New counsel appointed to represent Colleen.

May 5, 1976—After three continuances preliminary hearing set for June 3, 1976.

June 3, 1976—Grand jury indictment filed charging murder and willful mistreatment of James on April 13, 1974, and child abuse of and cruelty to Timothy on April 13, 1974, and between August 1, 1975 and November 18, 1975 (No. CR-37585).

June 8, 1976—Colleen arraigned and pleaded not guilty. Trial set for July 26, 1976.

July 26, 1976—Colleen's motion for trial date continuance to September 13, 1976, granted.

August 3, and 6, 1976—Colleen filed and served pretrial motions to be heard August 16.

August 16, 1976—People's motion for continuance of pretrial hearing granted to August 23.

August 23, 1976—Pretrial hearing set—People's motion for continuance of one week was denied.

August 26, 1976—Colleen's motion to dismiss for pretrial delay denied. The indictment (No. CR-37585) was dismissed, however, on the grounds the grand jury had not been fully apprised of exculpatory evidence (*Johnson* v. *Superior Court,* 15 Cal.3d 248 [124 Cal.Rptr. 32, 539 P.2d 792]).

August 31, 1976—People filed felony complaint making same charges as in indictment and preliminary hearing set for September 15, 1976.

September 15, 16, 17, 20, 21, 22, 1976—Preliminary hearing—Colleen bound over.

October 5, 1976—Information filed (No. CR-38536).

October 6, 1976—Pleaded not guilty, time waived and matter set for trial on January 10, 1977.

■    ■■■■ A preindictment delay amounts to a denial of due process[2] if the prejudicial effect outweighs any justification for it (*Jones* v. *Superior*

---

[2]This is a violation of the Fifth and Fourteenth Amendments to the United States Constitution and article I, sections 7 and 15 of the California Constitution as opposed to the right to a speedy trial provision of the Sixth Amendment and article I, section 15 of

*Court,* 3 Cal.3d 734, 740-741 [91 Cal.Rptr. 578, 478 P.2d 10]). ■ The statute of limitations is usually considered the primary guarantee against bringing overly stale criminal charges (*United States* v. *Ewell,* 383 U.S. 116, 122 [15 L.Ed.2d 627, 631-632, 86 S.Ct. 773, 777]; *People* v. *Archerd,* 3 Cal.3d 615 [91 Cal.Rptr. 397, 477 P.2d 421]). There is no statute of limitations on murder (Pen. Code, § 799). The defendant must show prejudice or improper motive by the prosecution in delaying an indictment (*Chapman* v. *United States* (2d Cir. 1967) 376 F.2d 705). After such a showing the burden shifts to the People to show the preindictment delay was the result of a valid police purpose (*People* v. *Wilson,* 239 Cal.App.2d 358, 365 [48 Cal.Rptr. 638]). In *People* v. *Gilmore,* 239 Cal.App.2d 125, 129 [48 Cal.Rptr. 449], the court held the accused must show basic unfairness resulting from the delay and establish there was no legitimate reason for the delay and that he was prejudiced by the delay. Prejudice may be shown in a number of ways, loss of a material witness or other missing evidence, or fading memory caused by lapse of time (*People* v. *Archerd, supra,* 3 Cal.3d 615, 639-640).

■ The facts and circumstances must be viewed in the light of (1) the time involved, (2) who caused the delay, (3) the purposeful aspect of the delay, (4) prejudice to the defendant, and (5) waiver by the defendant (*People* v. *Archerd, supra,* 3 Cal.3d 615, 640). A five-year delay in the indicting of the defendant for murder was held not unreasonable where no real prejudice was shown (*United States* v. *Feinberg* (2d Cir. 1967) 383 F.2d 60, 64, 67; *People* v. *Archerd, supra*).

■ Here the indictment came 28 months after James' death, a period well within the statute of limitations for a felony (Pen. Code, § 800, 3 years). It is contended two witnesses died in this period. Deputy Coroner John Petry died before the trial. He was the only medically oriented person to observe James at the scene and his report was relied on by Coroner's Doctor Katsuyama who performed the autopsy. It cannot be said, however, his testimony was essential to the defense since he did make a report of his findings for the coroner and took photographs. It is not explained how his testimony would be any more informational than his reports and the pictures.

---

the California Constitution. Where there is a preindictment delay and a contention that due process has been denied, the balancing test will not be used until it is established that the delay was intentionally caused by the state (*People* v. *Hannon,* 19 Cal.3d 588, 610, fn. 12 [138 Cal.Rptr. 885, 564 P.2d 1203]).

Another deceased witness was the taxi driver, Joseph Daris, who frequently transported Colleen and her children to Dr. Fox's office. By stipulation the court received into evidence his letter describing Colleen as a "warm loving mother." It does not appear this evidence of his brief encounters with Colleen when she was on her way to the doctor's office would be critical to the defense. In any event the letter pretty well summarizes his testimony.

Colleen also contends the delay occasioned an inability to obtain proof she called the hospital or six doctors at random about James' condition the day before he died. The duty nurse could not remember the call but Colleen said the nurse only referred her to the family physician or the doctors she called. She was unable to get their records. It was shown that records of such calls would not be available; as a matter of common knowledge records of such calls are rarely kept so Colleen's testimony is probably all that could be expected in any case. The fact of the calls is not critical when viewed in the light of the fact she did not take James to the hospital or obtain any actual medical care or treatment for him even though she knew his condition was very bad and he had a 105° temperature.

Colleen claims to have lost her diary during the long delay. The diary was in her possession and she had the means of keeping it safe if indeed it was important to her.

The trial court found the loss of this evidence did not undermine the defense. We can find no real prejudice to Colleen.

The justification for the delay was found in a general inability to prove criminal intent. The true facts about Colleen's attitude toward her children did not surface until her later conduct was examined. Timothy's improved health in the foster home, followed by marked deterioration in less than four months when he was returned to his mother provided the reason for the renewed interest by the authorities. This was valid police procedure especially when the first charges had been dismissed for lack of evidence. There is no showing of improper motive or of bad faith, rather a showing of reasonable effort to obtain evidence to support the allegations.

■ In *Penney* v. *Superior Court,* 28 Cal.App.3d 941, at page 954 [105 Cal.Rptr. 162]: "Once the People have presented the 'justification' for the delay, the court is then required to exercise 'a delicate judgment'

[citation], by balancing the public interest in favor of the prosecution against the rights of the defendant. [Citations.] In the weighing process, the seriousness of the crime for which the indictment is returned must be given appropriate consideration. The fact that the Legislature has decreed no statute of limitations for murder shows the importance that society places on governmental efforts to bring a murderer to the bar of justice. As recently stated by the United States Supreme Court in *Barker* v. *Wingo,* 407 U.S. 514 at page 522 [33 L.Ed.2d 101 at p. 112, 92 S.Ct. 2182]: 'The amorphous quality of the right [to speedy trial] also leads to the unsatisfactorily severe remedy of dismissal of the indictment when the right has been deprived. This is indeed a serious consequence because it means that a defendant who may be guilty of a serious crime will go free, without having been tried. Such a remedy is more serious than an exclusionary rule or a reversal for a new trial, but it is the only possible remedy.' "

We find no error in the trial court's finding there was no improper preindictment delay.

Judgment affirmed.

Brown (Gerald), P. J., and Staniforth, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 22, 1978. Mosk, J., was of the opinion that the petition should be granted.