[No. G000666. Fourth Dist., Div. Three. Feb. 6, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
MARY ANN BENWAY, Defendant and Appellant.

**COUNSEL**

Quin Denvir and Frank O. Bell, Jr., State Public Defenders, under appointment by the Court of Appeal, Thomas Bleauvelt, Courtney Shevelson and Therene Powell, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Michael D. Wellington, Patricia D. Benke and Louis R. Hanoian, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WALLIN, Acting P. J.**—Defendant Mary Ann Benway was convicted of second degree felony murder of her seven-month-old daughter, Raelynn. The principal issue on appeal is whether the merger doctrine barring application of the second degree felony-murder rule applies equally to all forms of felony child abuse. (Pen. Code, § 273a, subd. (1).)[1]

### FACTS

Mary Ann Benway gave birth to Raelynn in August 1979 while living with Raelynn's father, Tony Miller. Several months later, Miller and Benway separated.

Miller testified that Benway treated Raelynn "all right" while they were living together. However, he stated that in November 1979, Benway tossed Raelynn into the air and onto a sofa three to six feet away saying, "Stay out here with your father." Raelynn began crying, but did not appear to be hurt.

Miller saw Raelynn periodically after he and Benway separated. In January 1980, he noticed Raelynn had a black eye. Benway said Raelynn hit her face when she fell off a restaurant seat. Later in January, Miller noticed bruises on Raelynn's back while he was bathing her. Benway did not know how these bruises occurred.

In early 1980, Benway moved into an apartment with Raymond Boles, his seven-year-old son Ray Ray, and Boles' father Homer. Because of inadequate space in the apartment, Benway and Raelynn usually slept on a mattress in the living room.

In January and February 1980, Judy Carter, a babysitter and friend of both Miller and Benway, noticed Raelynn had a black eye and bruises on her back and rib cage. When she confronted Benway with her observations, she was told not to get involved. Carter said if she saw more bruises on Raelynn she would notify the police. Benway never asked her to babysit again. When Carter told Miller about the bruises, Miller said Benway had done it.

On February 12, 1980, Miller went to Colorado. He testified he wanted to take Raelynn with him for her own protection. He returned to California just before Raelynn's death. When he held her for the last time the day after

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

he returned, she seemed fussy and upset. He noticed she had another black eye. Benway explained that Raelynn hurt herself when she fell against a coffee table. A few days later, Miller told Judy Carter he was going to take Raelynn away from Benway.

In March 1980, Boles noticed bruises on Raelynn's stomach, chest, and side. Benway told him "Tony" had bruised the baby. Later in March, Boles, Benway and Raelynn were at a drive-in movie theater. In an attempt to quiet Raelynn, Benway shook her repeatedly then rapidly jerked the child to her chest. During the same week, Raelynn coughed up some phlegm with blood in it which Benway attributed to tonsillitis. Boles suggested Benway should take Raelynn to a doctor; Benway refused.

On March 17, 1980, Benway spent the morning with Raelynn and Boles. They went shopping, then went out to lunch. About 2 p.m., Boles drove Benway to work and then returned to the apartment with Raelynn. Just after 2 p.m. Boles put Raelynn on Homer's bed for a nap. Boles testified he checked Raelynn twice, found she had fallen onto the floor, and placed her back on the bed. At approximately 4 p.m., Boles picked up Raelynn and changed her diaper. Ray Ray looked at Raelynn and said, "Look at her eyes." Boles noticed her eyes were rolled back and she appeared "real limp." As Boles went to the phone to call Benway, the phone rang. It was Benway. Benway said "Bring her up here. She's all right." Boles rushed Raelynn to the restaurant where Benway was working as a waitress. Raelynn was given artificial respiration and taken to the hospital. She died five days later of massive hemorrhaging of the brain caused by a severe skull fracture. At the hospital, Boles told the police he had "never seen [Benway] abuse the baby that hard."

At trial, Dr. Richard Marble, an expert on child abuse, testified he believed Raelynn was a battered child and her injuries were inflicted rather than accidental. He felt the fatal head injury was inflicted four to six hours before Raelynn was admitted to the hospital. The injury probably was caused by a massive trauma directly to the head that required a tremendous swinging force consistent with the child being used as a baseball bat. The injury could have caused Raelynn to immediately lapse into a coma or it could have stunned her into brief unconsciousness followed by a conscious and relatively normal period before she would fall into a coma and die. He also testified Raelynn had bruises on her shoulder, back, nose, and ear which appeared to have been inflicted within two days of her death. In addition, Dr. Marble stated the injuries were of the type that a typical mother would notice.

Dr. Robert Richards, an autopsy surgeon, testified there was also evidence of a second head injury probably caused by severe shaking of Raelynn

which resulted in tearing of vessels separating the brain and skull. In addition, he testified Raelynn had a fractured pelvic bone and six fractured ribs. He believed the fractures occurred on more than one occasion within two weeks of her death. Finally he testified the fatal head injury would have immediately rendered Raelynn unconscious and she would not have regained consciousness before death.

The trial court, sitting without a jury, found Benway guilty of second degree felony murder based on her violation of section 273a, subdivision (1) (felony child abuse). The trial judge stated he felt there was "substantial evidence upon which a straight second-degree murder [conviction] could be found" but he "need not make that finding."

## DISCUSSION

Benway contends a second degree felony-murder conviction cannot be based on a violation of section 273a, subdivision (1)[2] because felony child abuse is an integral part of the homicide. Relying on the rule of *People v. Ireland* (1969) 70 Cal.2d 522, 538-540 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323] she argues the felony child abuse violation merges into the homicide and precludes application of the felony-murder rule.[3]

In a recent case, the California Supreme Court agreed with this position and held the *assaultive* variety of felony child abuse "was unquestionably an 'integral part of' and 'included in fact' in the homicide within the meaning of *Ireland.*" (*People v. Smith* (1984) 35 Cal.3d 798, 806 [201 Cal.Rptr. 311, 678 P.2d 886], fn. omitted.) In *Smith,* the defendant became angry when her two-year-old child ate a snack while on the floor instead of the couch. The defendant took the child to her bedroom and began "disciplining" her. David Foster, who lived with the mother, entered the room to

[2] Section 273a, subdivision (1) provides: "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of such child to be injured, or willfully causes or permits such child to be placed in such situation that its person or health is endangered, is punishable by imprisonment in the county jail not exceeding one year, or in the state prison for 2, 4, or 6 years."

[3] In a supplemental brief, Benway argues her conviction must be reversed because felony child abuse is not an inherently dangerous felony and, therefore, cannot support a second degree felony-murder conviction. She relies upon the Supreme Court's recent decision in *People v. Burroughs* (1984) 35 Cal.3d 824 [201 Cal.Rptr. 319, 678 P.2d 894]. In *Burroughs,* the Supreme Court held that practicing medicine without a license in violation of Business and Professions Code section 2053 could not be the basis for a second degree felony-murder conviction because it is not an inherently dangerous felony. Because we reverse on other grounds, we need not determine whether felony child abuse is necessarily inherently dangerous to human life. Nor do we address Benway's other contentions.

"assist" in the discipline. The two beat the child with their hands, hit her with a paddle, and bit her. At one point, Foster put a wastebasket on the child's head and hit it. The child eventually lost consciousness, went into respiratory arrest, and died. The court reviewed the history of the second degree felony-murder rule then stated: "In cases in which the violation of section 273a, subdivision (1), is a direct assault on a child that results in death (i.e., causing or permitting a child to suffer or inflicting thereon unjustifiable physical pain), it is plain that the purpose of the child abuse was the 'very assault which resulted in death.'" (*Ibid.*) Therefore, the court held the defendant could not be convicted of felony murder. (*Id.*, at p. 808.)

Based on the evidence presented at trial, Benway could have violated section 273a, subdivision (1), in three different ways. She could have assaulted Raelynn herself, permitted someone else to assault Raelynn in her presence, or placed Raelynn in a life threatening situation by leaving her with the person who had previously battered her daughter. According to the expert witness testimony, the fatal head injury was probably inflicted within six hours of the time Raelynn was admitted to the hospital. Raelynn was admitted at about 4 p.m.; therefore, the injury was inflicted sometime between 10 a.m. and 4 p.m. Since Benway was with Raelynn until 2 p.m., she had the opportunity to inflict the fatal injury herself. If Benway was the perpetrator, *Smith* would directly control this case. Thus, Benway's felony-murder conviction would be reversed because her act of inflicting the head injury would be the "very assault which resulted in death." (*Id.*, at p. 806.)

Conversely, if she was not the perpetrator and the fatal blow was inflicted before 2 p.m., she would have been present when it occurred. It is unclear whether *Smith* would also control if Benway was not the perpetrator but was present and "permitted" infliction of the fatal blow.[4]

The basis of the violation of section 273a, subdivision (1) here, however, was not a direct assault. The trial court specifically stated during sentencing that "the evidence did not demonstrate . . . beyond a reasonable doubt that, in fact, [Benway] was the perpetrator of the death dealing blow . . . ." Rather, the court stated she was "guilty of a second degree felony murder stemming from a violation of Penal Code section 273(a) [273a], because she knew what was going on at all times concerning that child or at least

---

[4]In *Smith,* the court proceeds on the premise that the defendant inflicted the death blow. However, Foster was present when the assault occurred and participated in the "discipline" of the child. Therefore, it is possible that the defendant was not the actual perpetrator although she was present when the act occurred. We cannot ascertain from the opinion whether this possibility was characterized as "assaultive" conduct with the defendant "permitting" the abuse or whether it was factually rejected but would have been considered "nonassaultive."

knew what the child had been suffering and yet failed to do anything about it, willfully failed to do anything about it or to prevent it." The *Smith* court referred to this type of conduct as "nonassaultive" felony child abuse but specifically stated it did not need to decide whether the merger doctrine applies to this situation. (*People* v. *Smith, supra,* 35 Cal.3d 808, fn. 7.) In this case, however, we must address that issue.

Section 273a, subdivision (1) proscribes a wide range of abusive conduct including child beating, child endangering, and child neglect. However, as noted in *Smith,* all violations of the statute must be willful and must be committed "under circumstances or conditions likely to produce great bodily harm or death." (§ 273a, subd. (1); *People* v. *Smith, supra,* 35 Cal.3d at p. 806.) Within the statute each form of felony child abuse is prefaced with the words "causes or permits." (§ 273a, subd. (1).) Thus, a person violates the statute if he or she *"causes or permits* any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully *causes or permits* the person or health of such child to be injured, or willfully *causes or permits* such child to be placed in such situation that its person or health is endangered . . . ." (*Ibid.,* italics added.)

The statute itself does not differentiate between "assaultive" and "nonassaultive" or "active" and "passive" child abuse. According to the statute's terms, an offender is equally culpable regardless of the form of the abuse. Apparently, the Legislature intended to treat all forms of abusive conduct in the same fashion. However, the Supreme Court in *Smith* expressly categorized felony child abuse as being either "assaultive" or "nonassaultive" in nature. By establishing a distinction between "assaultive" and "nonassaultive" abuse, the court inferentially recognized it was possible that the two forms of abuse could be viewed differently for purposes of the *Ireland* rule. Yet the court did not state that they should be treated differently.

Moreover, the *Smith* court did not disapprove of *People* v. *Shockley* (1978) 79 Cal.App.3d 669 [145 Cal.Rptr. 200] which upheld the application of the felony-murder rule where the underlying felony was child abuse by extreme neglect. In *Shockley,* the court stated the cause of death of the 21-month-old child was malnutrition and dehydration. The evidence indicated the mother did not clean the child or his room. There was urine and fecal matter on both the child and his bed. At the time of death, there was evidence of several recent bruises. In rationalizing the application of the felony-murder rule, the *Shockley* court stated: "The act of leaving the child in a position that endangers its person or health is clearly collateral and independent of any design to cause death. The act may be based on indif-

ference or neglect or simply failure to take time to properly look after the child." (*Id.*, at p. 677.)

Contrary to the holding in *Shockley,* we believe there is *not* an independent felonious design when a child is neglected or placed in a dangerous situation under circumstances likely to cause death. Rather, the omission to act is no different from an act which produces the same result; either is *likely* to result in death. Moreover, because of the unique duty created in section 273a, subdivision (1), to protect children from extreme physical or mental harm or from life endangering situations, we believe *any* violation of the statute is likely to result in death.

We see no reason why the felony-murder rule should apply to some—but not all—violations of section 273a, subdivision (1). For example in *Smith* and *Shockley,* both defendants were guilty of creating a life threatening environment for their children despite the affirmative duty imposed upon them by section 273a, subdivision (1). The only difference is that the defendant in *Smith* accomplished this result by direct physical abuse while in *Shockley* the defendant employed an indirect method. The distinction between the form of abuse does not justify disparate treatment among defendants who severely abuse children. It would make little sense to treat those who directly batter their children more leniently than those who inflict no injuries themselves but merely allow others the opportunity to do so. Therefore, we conclude all forms of felony child abuse, whether "assaultive," "nonassaultive," "active," or "passive," constitute a "single course of conduct with a single purpose." (*People* v. *Burton* (1971) 6 Cal.3d 375, 387 [99 Cal.Rptr. 1, 491 P.2d 793].) The conduct is "an 'integral part of' and 'included in fact' in the homicide within the meaning of *Ireland."* (*People* v. *Smith, supra,* 35 Cal.3d at p. 806, fn. omitted.) Thus, when death occurs, the act or omission to act merges into the homicide.

This result is also supported by the purpose of the felony-murder rule itself. The Supreme Court in *Smith* reiterated that "the ostensible purpose of the felony-murder rule is not to deter the underlying felony, but instead to deter negligent or accidental killings that may occur in the course of committing that felony." (*People* v. *Smith, supra,* 35 Cal.3d at p. 807.) As in *Smith,* when a person willfully causes or permits the infliction of unjustifiable pain *or* willfully causes or permits a child to be placed in a dangerous situation under circumstances likely to produce death, "it is difficult to see how the assailant would be further deterred from killing negligently or accidentally in the course of that felony by application of the felony-murder rule." (*Ibid.*) Furthermore, by further restricting the application of the felony-murder rule, we comply with the Supreme Court's directive that the felony-murder rule " 'should not be extended beyond any rational function

that it is designed to serve' [and should] be given the narrowest possible application consistent with its ostensible purpose . . . ." (*People* v. *Smith, supra,* 35 Cal.3d at p. 803.)

Applying the felony-murder rule in the narrowest possible way, as we must, we are compelled to conclude there is no independent felonious design when *any* form of felony child abuse is willfully committed under circumstances likely to produce great bodily harm or death. Therefore, Benway's act of placing Raelynn in a dangerous situation must merge into the homicide. Consequently, it was error to convict Benway of second degree felony murder.

However, Benway could properly be held for involuntary manslaughter. (*People* v. *Spring* (1984) 153 Cal.App.3d 1199 [200 Cal.Rptr. 849].) Justice Kaus' explanation in *People* v. *Garcia* (1972) 27 Cal.App.3d 639, 647-648 [104 Cal.Rptr. 69] is apropos: "Had the trial resulted in a conviction of [in]voluntary manslaughter, this court could not touch it. Defendant has, at most, shown that [s]he is entitled to a reduction to that crime. The People, however, are privileged to try to obtain another conviction of murder. The record clearly contains sufficient evidence to justify the attempt. On the other hand, the prosecution may decide that it is satisfied with [in]voluntary manslaughter—a decision which we neither suggest nor discourage. Our disposition should, therefore, preserve these options. (Cf. Pen. Code, §§ 1260, 1262; *People* v. *Aikin,* 19 Cal.App.3d 685, 706 [97 Cal.Rptr. 251]; *People* v. *Shavers,* 269 Cal.App.2d 886, 889-890 [75 Cal.Rptr. 334].) [¶] The judgment is reversed with directions as follows: If the People, within 30 days from the issue of the remittitur, file a written demand for a new trial, such a trial shall take place; if no such demand is filed, the trial court shall proceed as if the remittitur constituted a finding of guilty of [in]voluntary manslaughter (Pen. Code, § 192, subd. [b]) on such thirtieth day and proceed to resentence defendant after appropriate proceedings with respect to a possible grant of probation. (See *People* v. *Causey,* 230 Cal.App.2d 576, 579 [41 Cal.Rptr. 116].)"

Crosby, J., concurred.

**SONENSHINE, J.**—I concur in the majority opinion but make an additional observation.

As evidenced by *People* v. *Burroughs* (1984) 35 Cal.3d 824 [201 Cal.Rptr. 319, 678 P.2d 894] and *People* v. *Smith* (1984) 35 Cal.3d 798 [201 Cal.Rptr. 311, 678 P.2d 886], the second degree felony-murder rule is gasping for breath. If not already dead its days are certainly numbered.

However, resuscitation or if necessary resurrection is still possible. The Legislature, if of course it deems it appropriate, may codify the rule.

*People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], addressing statutory first degree felony murder, demonstrates the benefit when doctrines with such important ramifications for all concerned have a specific statutory basis upon which courts determine their correct application.

Respondent's petition for review by the Supreme Court was denied May 23, 1985.