[No. D014519. Fourth Dist., Div. One. Oct. 20, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES EVERS III, Defendant and Appellant.

COUNSEL

David M. McKinney, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, M. Howard Wayne and Gil P. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WIENER, Acting P. J.**—A jury found defendant James Evers III guilty of second degree murder (Pen. Code, § 187, subd. (a))[1] and child endangerment (§ 273a, subd. (1)) in the death of his two-year-old stepson Michael. The court sentenced Evers to prison for 15 years to life for the murder conviction. The court also imposed an additional one year, four months for his conviction of child endangerment plus five years for his conviction of a prior serious felony conviction. Evers appeals, asserting instructional, evidentiary, and sentencing errors. We affirm.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

## Factual and Procedural Background

*Michael's Death*

Evers lived with his wife, Shawn, their one-year-old child Brianna, and two-year-old Michael, Shawn's child from a previous marriage. On November 13, 1990, at about 10:30 p.m. Shawn put Michael to bed. A few minutes later Shawn was going to check on the children, but Evers, in a passionate way, blocked her from doing so. Shawn found this unusual. Later Shawn went to bed. Because she took medication for her epilepsy, she was a heavy sleeper.

Early the next morning, Shawn's mother, Elizabeth Lenderts, arrived at the Evers's apartment to take the children to their babysitter. Shawn had just awakened. Lenderts found Michael lying on the floor in his bedroom, turned him over and discovered he was not breathing. Shawn's resuscitation efforts were unsuccessful. Michael was already dead.

An autopsy established the cause of death was "blood injuries" to the head. Michael had hemorrhaged in the forehead region and had four small hemorrhages along the left temple. The brain contained a fresh laceration or tear of the corpus callosum, a group of nerves connecting the left and right hemispheres of the brain fairly deep beneath the surface. There had also been bleeding beneath a thin membrane covering the brain and the retina area of the eyeballs. The pathologist also found some external injuries to Michael's face and body and severe internal injuries to his abdomen. The pathologist opined Michael's head injuries were caused by "very major force" and that his death was nonaccidental. In all likelihood Michael was killed by "violent shaking, violent angry whipping back and forth in the head" or by slamming him down on a soft surface.

Dr. David Chadwick, director of the center for child protection at Children's Hospital, testified Michael's head injuries would have required a substantial impact, equivalent at least to a 10-foot drop and possibly a 20- to 30-foot fall. He agreed that absent skull fractures, Michael's head injuries were most likely due to fast motion and change of direction such as shaking or being slammed down on a soft surface. The type of injuries to Michael's abdomen most often occur due to "nonaccidental trauma . . . . either being stepped on, stomped on, . . . or struck with a fist . . . with most of the weight of the adult behind that force." Dr. Chadwick concluded Michael's death was nonaccidental and he might have survived his injuries had he been taken for immediate medical care.

*Prior Acts of Abuse*

The prosecution introduced evidence showing Evers had abused both Michael and Brianna on at least two earlier occasions.

On September 5, 1989, less then a month after Shawn married Evers, Michael was hospitalized for a week for treatment of second degree burns on his feet. Evers initially told the police he was home alone with Michael and the burns occurred when Michael accidentally knocked over a pot of boiling water. Later, Evers changed his story and said Michael had been accidentally burned when he left him alone in the bathtub.

The prosecution also introduced testimony from two experts who testified Michael's burns could not have been accidental, explaining the burns had a "stocking distribution" or a very clear line of demarcation between the burned area and normal skin. Such burns are almost always nonaccidental since the burn must occur as the result of being held motionless in hot water.

After the burn incident Evers went on a six-month tour with the United States Navy. Shawn gave birth to Brianna shortly after Evers's return. On April 22, 1990 six-week-old Brianna was admitted to the hospital with severe brain injuries. She was admitted in an unconscious state and a near unresponsive state of cardiorespiratory arrest. Brianna was bleeding on the inner and outer surface of the brain and was hemorrhaging in the retinas of her eyes. Brianna displayed "Shaken Infant Syndrome," a trauma resulting from a child being shaken so violently as to produce major decelerating or accelerating events. As a result of her injuries, Brianna has paralysis of all four extremities and has no control of movements. She is now a "profoundly handicapped person" who will require assistance for all her needs.

Evers initially explained Brianna's injuries by telling the police he noticed she was not breathing when he went in to check on her in her crib. He quickly commenced cardiopulmonary resuscitation. Brianna started to breath again but then stopped. Evers then took her to the hospital.

Later, Evers modified his story, explaining he tripped while running to get Brianna to the hospital and the child flew out of his arms and onto the grass. Evers again changed his story, saying he became frustrated with Brianna's crying, picked her up, and tossed her into the air a couple of times. Brianna kept crying so he shook her and she stopped breathing.

Evers was charged with child endangerment with respect to Michael's burn injuries (§ 273a, subd. (1)) and child endangerment and infliction of cruel and inhuman corporal punishment with respect to Brianna's injuries. (§§ 273a, subd. (1), 273d.) In exchange for Evers's guilty plea to the charge relating to Michael's injuries and an admission to a great bodily injury allegation, the prosecution dismissed the counts relating to Brianna pursuant to a *Harvey* waiver (*People* v. *Harvey* (1979) 25 Cal.3d 754 [159 Cal.Rptr.

696, 602 P.2d 396]). The court granted Evers five years' probation, on condition he cooperate with the juvenile court orders, one of which was to have no contact with his children. Three months later, in mid-September, 1990, Evers violated the no-contact order and moved back in with Shawn and the children. It was only two months later that Michael was found dead in his bedroom.

### Defense

Evers neither testified nor presented additional witnesses on his behalf. Instead, his counsel focused on the circumstantial nature of the prosecution's case. Counsel also stressed Evers's inexperience in dealing with children, asserting that if Evers inflicted injuries to Michael or Brianna, such injuries were unintentional.

### Verdict

The jury found Evers guilty of second degree murder[2] and child endangerment after determining he was not guilty of first degree premeditated or torture murder.

### DISCUSSION

### I.

### Manslaughter Instruction

Evers argues the court erred in refusing to instruct the jury on the lesser included offense of involuntary manslaughter.

A court must instruct on a lesser included offense when "there is evidence from which a jury composed of reasonable persons *could* conclude the defendant was guilty of the lesser crime. [Citations]." (*People* v. *Glenn* (1991) 229 Cal.App.3d 1461, 1465 [280 Cal.Rptr. 609]; see *People* v. *Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1].) In determining whether sufficient evidence supports a proposed instruction, the court should not weigh the evidence or determine the credibility of the witnesses. (*People* v. *Flannel, supra,* 25 Cal.3d at p. 684.) However, if the evidence supporting the lesser included offense is "minimal and insubstantial the court need not instruct on its effect." (*People* v. *Glenn, supra,* 229 Cal.App.3d at p. 1465.)

---

[2]The prosecution presented the second degree murder case on theories that Evers acted intentionally but without premeditation or that he acted with implied malice.

■ Involuntary manslaughter is "the unlawful killing of a human being without malice. . . . [¶] . . . in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection. . . ." (§ 192.)

Severe physical abuse, such as occurred in this case, is a felony. (See § 273a, subd. (1).) Notwithstanding the text of section 192, subdivision (b), our Supreme Court in *People* v. *Burroughs* (1984) 35 Cal.3d 824 [201 Cal.Rptr. 319, 678 P.2d 894], has construed "lawful act" to include non-inherently dangerous felonies. (*Burroughs, supra,* at p. 836.) *Burroughs* reasoned this interpretation was necessary to avoid the "anomalous" result "that while one who kills in the course of a *lawful* act without due caution and circumspection is guilty of involuntary manslaughter, [another person] who allegedly commits a homicide while committing a noninherently dangerous *felony*, is guilty only, perhaps, of a battery." (*Ibid.*; see also *People* v. *Rhodes* (1989) 215 Cal.App.3d 470, 476 [263 Cal.Rptr. 603].) Thus, because child endangerment under section 273a, subdivision (1) is not a felony inherently dangerous to human life, (*People* v. *Lee* (1991) 234 Cal.App.3d 1214, 1222-1229 [286 Cal.Rptr. 117]; *People* v. *Caffero* (1989) 207 Cal.App.3d 678, 682-684 [255 Cal.Rptr. 22]), the court should have given an instruction on involuntary manslaughter provided there was sufficient evidence—evidence which was not minimal or insubstantial—showing Evers acted "without due caution and circumspection."

■ The words "without due caution and circumspection" refer to criminal negligence—unintentional conduct which is gross or reckless, amounting to a disregard of human life or an indifference to the consequences. (*People* v. *Penny* (1955) 44 Cal.2d 861, 879 [285 P.2d 926].) If a defendant commits an act endangering human life, without realizing the risk involved, the defendant has acted with criminal negligence. By contrast where the defendant realizes and then acts in total disregard of the danger, the defendant is guilty of murder based on implied malice. (See *People* v. *Cleaves* (1991) 229 Cal.App.3d 367, 378 [280 Cal.Rptr. 146].) ■ Thus the pivotal question here was whether there was sufficient evidence for a reasonable juror to find Evers acted without consciously realizing the risk to Michael's life. (*Ibid.*)

■ Evers argues he comes within this less culpable category and is therefore entitled to the involuntary manslaughter instruction because Michael's death was the result of his inexperience as a parent in handling

children and not the product of his conscious disregard of the risk to Michael's life.[3]

We are sensitive to this argument. The stresses on a young parent are many. There indeed may be situations where the young and inexperienced parent is entitled to have the jury consider whether the parent may have acted without comprehending the risk involved in disciplining his or her young child. This is not such a case, however.

Evers, then in his early 20's, married Shawn, when Michael was one year old. Less than a month later he burned Michael's feet. About eight months later his conduct caused Brianna's injuries. There is nothing in the record to suggest he was unaware of the risk he was creating on these occasions. The record is also devoid of evidence that there might have been something in Evers's background which precluded him from understanding the risk to Michael from the physical abuse or that Evers was mentally or emotionally impaired so that he could not understand the risk he was causing to Michael's life.

The only possible inference the jury could draw from the evidence presented was that Evers knew and understood the probable consequences of his action, in addition to his having inflicted injuries on Michael and Brianna on two earlier occasions.

The *severity* of Michael's injuries on this occasion makes clear that whoever abused Michael had to know such abuse would likely cause serious injury or death. The undisputed evidence showed Michael was physically abused with "major force" causing injuries equivalent to those resulting from a 10- to 30-foot fall.

The source for Evers's claim of instructional error is counsel's argument discussing Brianna's injuries: "[P]erhaps [Evers] did shake [Brianna] too hard. But . . . it's reasonable that this man . . . was put in a situation where he didn't know what to do; he didn't have a baby before." Without evidence, however, defense counsel's closing argument is insufficient by itself to trigger a manslaughter instruction. A court must instruct on a theory proffered by the defense only where it can be supported by substantial evidence. (See *People* v. *Flannel, supra,* 25 Cal.3d at p. 684.) The

---

[3]Evers also says the manslaughter instruction was required because the prosecution's case was based upon circumstantial evidence regarding *how* Michael died. The fact that there is no direct evidence of a crime, however, does not in and of itself support a lesser included offense instruction. Rather, in such situation, the defense must posit some scenario based upon the evidence at trial showing the jury could reasonably find the defendant guilty of the lesser included offense. Evers fails to make such showing here.

court is not even required to give an involuntary manslaughter instruction where the defendant's self-serving statements denying intent to kill are deemed insubstantial in character. (*People* v. *Hendricks* (1988) 44 Cal.3d 635, 643 [244 Cal.Rptr. 181, 749 P.2d 836].)

On this record, which establishes Evers intentionally used violent force against Michael, knowing the probable consequences of his action, Evers cannot be said to have acted without realizing the risk of death or serious bodily injury. Accordingly, the court was not required to give an instruction on involuntary manslaughter. (See *People* v. *Hendricks, supra,* 44 Cal.3d at p. 643; *People* v. *Rhodes, supra,* 215 Cal.App.3d 470, 475.)

## II.

### *Prior Acts of Abuse*

Evers contends the court erred in admitting evidence of his prior felony conviction for severely burning Michael's feet and evidence he inflicted severe injuries on Brianna, leaving her a quadriplegic.

### A.

Evidence Code section 1101, subdivision (a) prohibits admitting evidence of prior conduct to show a defendant's disposition to act similarly on a specific occasion. This general rule, however, is substantially qualified in Evidence Code section 1101, subdivision (b), which provides, "Nothing in this section prohibits the admission of evidence that a person committed a crime . . . when relevant to prove some fact (such as motive, opportunity, intent, . . . identity . . . or accident . . .) other than his or her disposition to commit such an act." Such evidence must tend logically, naturally and by reasonable inference to prove the issue upon which it is offered. (*People* v. *Guerrero* (1976) 16 Cal.3d 719, 724 [129 Cal.Rptr. 166, 548 P.2d 366].)

We conclude the evidence of Evers's prior acts of abuse was properly admitted to show Evers's knowledge and that Michael's injuries arose from nonaccidental means.

The evidence of Brianna's injuries was probative to show Evers's awareness that serious injury or death could result from physical abuse, such as shaking a very young child, and the importance of immediate medical care in saving an injured child's life. The prosecution argued that despite such knowledge, Evers abused Michael in a manner similar to that of Brianna and deliberately left Michael lying on the floor to die. These facts were highly

relevant to establish the requisite mental state for a first or second degree murder conviction.

The evidence was likewise admissible to establish Michael's injuries did not arise from accidental means. The fact that Evers had abused the children in the past was relevant to show Michael's injuries were inflicted deliberately. Evers argues the question whether Michael's death was accidental "was not in issue." Such assertion is not supported by the record. While Evers produced no evidence showing Michael's injuries could have occurred accidentally, defense counsel attempted to establish such fact based on the circumstantial nature of the prosecution's evidence. During closing statements, for example, counsel strongly implied Michael's injuries could have occurred from various sources and not necessarily through Evers's physical abuse.[4]

### B.

When evidence of prior offenses is presented to a jury, there is inherent danger of prejudice to an accused. Therefore, such evidence should be received with caution and admitted only when its probative value outweighs its prejudicial effect. (See *People* v. *Malone* (1988) 47 Cal.3d 1, 17 [252 Cal.Rptr. 525, 762 P.2d 1249].) The court specifically instructed the jurors not to consider the prior acts evidence to prove Evers "is a person of bad character or that he has a disposition to commit crimes." The prosecutor also reminded the jurors the evidence "cannot be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes."

In permitting the evidence to come before the jury, the court listened to arguments on this issue and balanced the probative value against the likely prejudice of the evidence. Given the importance of the evidence to establishing the prosecution's case on several critical issues and the limiting

---

[4]Contrary to Evers's assertions, our ruling that insufficient evidence supported the giving of a manslaughter instruction does not mean the question whether Michael's injuries arose from an accident was not at issue. The prosecution was required to establish the injuries could not have occurred accidentally. This was particularly important because of the circumstantial nature of the case and the fact the defense never stipulated the injuries occurred through deliberate abuse. The fact the defense did not present evidence disputing the injuries must have been inflicted deliberately, does not mean the prosecution's evidence on this issue was irrelevant.

Additionally, contrary to Evers's assertions, the fact the experts testified the injuries occurred nonaccidentally does not mean the court abused its discretion in allowing the evidence because it was cumulative. Evidence is cumulative if it is repetitive of evidence already before the jury. The prior acts evidence was of an entirely different nature than the expert opinions. There was no abuse of discretion.

instructions to the jury, we conclude the court did not err in admitting the evidence of the two instances of prior child abuse.

### III.

#### The Videotape Reenactment

During the police investigation of Brianna's injuries, Evers agreed to participate in a videotaped reenactment showing the manner in which Brianna had been injured. In the eight-minute videotape, Evers demonstrated how while he was running, he tripped and Brianna fell out of his arms and onto the grass. Evers later admitted to police that the story was a fabrication, and that instead Brianna stopped breathing after he tossed her in the air and shook her to make her stop crying. ▮ Evers contends the court erred in admitting the videotape because it related solely to a prior uncharged offense and because it was cumulative.[5]

The evidence surrounding Evers's prior abuse of Brianna was not prohibited by Evidence Code section 1101, subdivision (a). (See *ante* at p. 598.) Therefore since the tape showed Evers's attempt to explain Brianna's injuries, it was likewise admissible under section 1101, subdivision (b). The fact that Evers initially lied about the reason for Brianna's injuries was relevant to explain the entire circumstances surrounding Brianna's injuries and to establish Evers knew that what he did to Brianna was wrong. Significantly, Evers never objected to the evidence of his fabrication on the grounds it was irrelevant. His objection was directed only to the showing of the videotape.[6]

The tape, however, was cumulative. Before the videotape was shown to the jury, Officer Richard Arendt testified Evers had told the story about tripping on the grass, but that he later recanted this version. Since the jury already heard evidence on this issue and since the videotape concerned a collateral matter pertaining to the way in which Evers lied to the police, there was no need for the jury to also see the tape.

We conclude the error was harmless. The evidence in the tape was not inflammatory. It did not portray Evers hurting a child or committing any

---

[5]Evers also argues the court erred in admitting the tape as an exception to the hearsay rule because it is not hearsay. We have a hard time understanding the significance of any such error. Since Evers agrees the evidence was not hearsay, there was no need for a hearsay exception and the evidence would be admissible in any event.

[6]Initially, Evers objected to the police officer's *testimony* on the subject, saying the testimony violated the best evidence rule and instead the jury should be shown the videotape or a tape recording. In response to such objection, the prosecution offered to show the videotape. The next day, however, defense counsel reversed his position, and objected to the tape on several grounds, including that it was hearsay and cumulative. Because these objections were asserted before the videotape was shown, Evers did not waive his right to assert error.

other form of violence. It solely portrayed Evers lying. According to Evers, the tape's primary evil was that it emphasized the fact he was not credible. Since there was already substantial evidence on Evers's credibility, we conclude it is not reasonably probable that had the tape been excluded the jury would have reached a different result. We also note that Evers must have felt his performance on the tape was at least somewhat helpful to his case since his lawyer referred to the tape in closing argument saying it demonstrated Evers had a "sense of responsibility" implying it showed Evers's "demeanor" in a positive light.

## IV.

### Section 654

 Evers says his sentences for second degree murder and child endangerment violate section 654's proscription against double punishment.

### A.

The relevant portion of the child endangerment statute, section 273a, subdivision (1), provides: "Any person who, under circumstances or conditions likely to produce great bodily harm or death, . . . willfully causes or permits such child to be placed in such situation that its person or health is endangered, is punishable by imprisonment . . ." Evers's guilt of this offense was based on his returning to his home, knowingly putting the children at risk for further child abuse. The court explained to the jury the child endangerment count rested "on the fact that the defendant moved back into the house with the children."

Frankly we are uncomfortable with the notion that a person can be guilty of violating section 273a, subdivision (1) by doing nothing other than being physically close to a child. In spite of our discomfort, however, we conclude that in the circumstances of this case Evers was properly convicted and sentenced for the offense of child endangerment.

For our purposes it is significant that Evers has not challenged his conviction of child endangerment. His quarrel is with the court having sentenced him for that offense. To establish Evers's guilt of section 273a, subdivision (1), the prosecution was required to prove a specific act. In doing so here, the prosecution established Evers violated the no-contact order and returned home thereby willfully causing or permitting his children

to be at risk.[7] Based on evidence showing Evers was a known child abuser who had previously severely injured his two children, the jury could find him guilty of this offense. In effect the jury could have compared Evers to a ticking time bomb who intentionally placed himself in a house where he could explode when triggered by a young child's typical behavior. In this scenario Evers's entry into the house and his remaining there constituted a willful creation of a dangerous situation permitting criminal sanctions. There is nothing in the legislation to suggest the Legislature intended to exclude the situation presented in this case.

## B.

Does section 654,[8] however, bar punishment for both second degree murder and child endangerment pursuant to section 273a, subdivision (1)?

■ Section 654 precludes multiple punishment for a single act or for a *course of conduct comprising indivisible acts. "Whether a course of criminal conduct is divisible . . . depends on the intent and objective of the actor."* Neal v. State of California* (1960) 55 Cal.2d 11, 19 [9 Cal.Rptr. 607, 357 P.2d 839]; accord *People* v. *Perez* (1979) 23 Cal.3d 545, 551 [153 Cal.Rptr. 40, 591 P.2d 63].) "[I]f all the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once." (*People* v. *Harrison* (1989) 48 Cal.3d 321, 335 [256 Cal.Rptr. 401, 768 P.2d 1078].)

■ Although there is a plethora of authority interpreting section 654, the parties do not direct us to any case on the precise issue before us— whether a defendant can be punished for child endangerment which ultimately manifests in an intentional killing (second degree murder). The Attorney General implicitly acknowledges, and we agree, if both offenses occurred at the same time section 654 would prohibit multiple punishment. For example, if Evers had fatally abused Michael the day he returned home, there would only be one criminal act and multiple punishment would be prohibited. Here, however, the prosecution's theory was that Evers violated section 273a, subdivision (1) by moving back home in mid-September 1990,

---

[7]The jury was told the word "willfully" meant "knowledge of the consequences" or "purposefully."

[8]Section 654 provides, "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one . . ."

about two months *before* he murdered Michael.[9] On such theory, we can easily discern two criminal acts: (1) Evers's return home in mid-September 1990, deliberately placing himself in contact with the children and knowingly creating a dangerous situation and (2) Evers's fatal abuse of Michael on November 13th, 1990. Our task therefore is to determine whether the two criminal acts constituted a "course of conduct" and if so whether Evers's objectives in committing both crimes were identical.

We conclude the two acts did not comprise a single course of conduct. While the fact that one crime is "technically complete" before the other begins does not in and of itself establish that multiple punishment is permissible (see *People* v. *Bauer* (1969) 1 Cal.3d 368, 377 [82 Cal.Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398]), here the two "offenses were far more than 'technically complete.'" (*In re William S.* (1989) 208 Cal.App.3d 313, 318 [256 Cal.Rptr. 64].) Evers violated the child endangerment statute when he came in contact with his children. The acts underlying the murder did not commence until over two months later. The only similarities between the two crimes were that Michael was a victim of both offenses and Evers's return home made it more likely he would commit the murder. Absent a more substantial connection, the crimes occurring over two months apart[10] were not so "intertwined" so as to constitute a continuous course of conduct. (See *In re William S., supra,* 208 Cal.App.3d 313, 319.)

Moreover, on this record we cannot say Evers had identical criminal objectives when committing each of the crimes. In finding Evers guilty of second degree murder, the jury necessarily determined Evers acted with a conscious disregard for human life. While Evers's criminal intent in returning home was to knowingly place Michael in a dangerous situation, there was no showing at the time he violated the juvenile court's order Evers

[9]In his closing statements, the prosecutor explained: "Count 2 is based upon the defendant's coming back into the apartment . . . placing himself in a position of care and custodian for Michael. He did that after the juvenile court said stay away. . . . And by doing that with the knowledge of what he had done to Michael in the past, . . . [and] Brianna as well, he knew what a danger he represented to those children. . . . And by doing that, he placed Michael in a position where it was likely that [Michael's] health or his person was in a situation where he was in danger . . ."

After closing statements, the court also emphasized the differences between the two offenses: "Count 1 is the murder charge; count 2 is child endangerment. And it is distinguished because count 2 as it is being alleged here by the prosecutor is based on the fact that the defendant moved back into the house with the children before the incident of Michael's death. So they are separate and not referring to the same incident."

[10]While the "temporal proximity" of multiple crimes is not *determinative* of the applicability of section 654 (see *People* v. *Ordonez* (1991) 226 Cal.App.3d 1207, 1239 [277 Cal.Rptr. 382]), it is a relevant consideration in the analysis. Evers has not cited, nor has our research disclosed, any case in which section 654 was held to apply to crimes committed with such a substantial time interval.

intended to kill Michael or that he was acting with a conscious disregard for his life. ■■■ The question whether the defendant's acts constitute " 'an indivisible course of conduct is primarily a factual determination, made by the trial court, on the basis of its findings concerning the defendant's intent and objective in committing the acts. [Citations.] This determination will not be reversed on appeal unless unsupported by the evidence presented at trial.' (*People* v. *Ferguson* (1969) 1 Cal.App.3d 68, 74-75 [81 Cal.Rptr. 418].)" (*In re William S.*, *supra*, 208 Cal.App.3d at p. 318.) ■■■ The evidence here supported the trial court's conclusion.

Evers's separate sentence on the child endangerment count was not barred by section 654's prohibition on multiple punishment.[11]

## DISPOSITION

Judgment affirmed.

Work, J., and Froehlich, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 20, 1993.

---

[11]In so concluding we are unpersuaded by Evers's analogy to felony-murder cases. (See *People* v. *Smith* (1984) 35 Cal.3d 798 [201 Cal.Rptr. 311, 678 P.2d 886] [holding the defendant could not be convicted of second degree felony murder because the underlying child endangerment conviction merged with the homicide]; *People* v. *Benway* (1985) 164 Cal.App.3d 505 [210 Cal.Rptr. 530] [holding all forms of felony child abuse, including "nonassaultive" child abuse, merge with the homicide for purposes of applying the felony-murder rule]; *People* v. *Shockley* (1978) 79 Cal.App.3d 669 [145 Cal.Rptr. 200] [upholding the application of the felony-murder rule when the underlying felony was child abuse by extreme neglect].) The question here is whether the two punishments are inappropriate because the defendant engaged in a "continuous course of conduct" with a single intent. The felony-murder analysis is inapplicable for purposes of applying such rule in this case.