Filed 12/19/25  P. v. Sills CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ERIC SCOTT SILLS,<br><br>    Defendant and Appellant. | G063930<br><br>(Super. Ct. No. 19HF0572)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Patrick H. Donahue, Judge. Affirmed.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

"'To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist.'" (*People v. Souza* (2012) 54 Cal.4th 90, 115–116 (*Souza*).)

Eric Scott Sills killed his wife Susann in an upstairs bedroom of their home.[1] Susann had wounds all over her body and a broken vertebra in her neck. Susann died from ligature strangulation. Sills moved Susann's body to the staircase to make it appear as though she died from a fall, rather than from his assaultive conduct. A jury convicted Sills of second degree murder.

Sills claims the trial court should have instructed the jury sua sponte on involuntary manslaughter as a lesser included offense. Sills argues that a reasonable jury could have found that he "did not realize the danger to [Susann's] life his assaultive conduct posed."

We find no evidence in the record to support a plausible theory that Sills (a medical doctor) did not realize that his assaultive conduct was dangerous to human life. Thus, we find that the trial court did not commit an instructional error, and we affirm the judgment.

## I.

## FACTS AND PROCEDURAL BACKGROUND

In November 2016, Sills and Susann lived in a home in San Clemente with their twin 12-year-old children, M.S. (Daughter) and E.S. (Son). Sills was a doctor at a fertility clinic, which was managed by Susann.

---

[1] In the interest of clarity, we will refer to Susann by her first name. No disrespect is intended. We note that in the appellant's opening brief and in the reply brief, Susann's name is misspelled as Susan.

The family had two large dogs. At night, the dogs slept in a crate downstairs.

On Saturday, November 12, 2016, Susann spent most of the day sleeping on a couch because she had a migraine headache. That night, Daughter suggested that Susann sleep in Daughter's upstairs bedroom, which was the quietest room in the house. Daughter wanted the room to be nice and look like a hotel, so she left out a box of tissues, and turned down the bed. Daughter saw no blood in her bedroom. Daughter went to sleep upstairs in her parents' master bedroom at about 9:30 p.m.

At this time, Son was in his bedroom, which was closest to Daughter's bedroom. Son was doing his homework and playing video games. At about 11:00 p.m., Son went downstairs to get something to drink. Son sat on the couch with his mother and watched TV for about an hour. At about midnight, Susann put the dogs in their crate, and they both went upstairs. Son went into his bedroom and Susann went into Daughters' bedroom.

At about 4:00 a.m., Son woke up when he heard his parents arguing and talking loudly in Daughter's room. After about five minutes, Son went into the master bedroom where Daughter was sleeping on her parents' bed. Son explained to Daughter that he heard their parents talking loudly and they both went to sleep in their parents' master bedroom.

At about 6:30 a.m., Son and Daughter awoke. Sills talked to them about going out to get donuts and then going to the pool afterwards. Daughter and Sills were walking out of the master bedroom when Daughter saw Susann lying face down on the stairs. Sills told Daughter to call 911. Son heard the commotion and walked downstairs.

Sills spoke to the 911 operator and said that he needed an ambulance and paramedics. After Sills gave the address, Sills said, "We've got a patient here who's fallen off stairs and I don't have a pulse and she's

3

cold and I don't know what time this happened." Sills said that Susann was "not breathing." The 911 operator directed Sills to put her on her back. Sills put the call on a speaker phone. Sills said that he found Susann "partially on the stairs." Sills said, "Looks like her shoe come [*sic*] off or something. So you want me to put her on her back?" Sills and Daughter then turned Susann on her back at the direction of the 911 operator. Daughter said that she saw a scarf loosely wrapped around Susann's neck, which she removed by sliding over her head because she thought it might keep her from breathing.[2]

The 911 operator gave instructions to Sills on how to do chest compressions. The operator asked if Susann had "any bleeding or any obvious sign or trauma or injury?" Sills said, "Uh, I mean she must have fell on her face." Sills said, "I'm doing the CPR. Hold on. I'm trying to blow in some, uh, air." The operator said, "If you're trained for the rescue breaths that's fine. If you're not trained with that, let's just continue with the compressions." The operator said, "Just continue with the compressions until paramedics arrive and take over." Sills said, "We have a, uh, a . . . a pulse oximeter. Eh, that shows that there is a pulse but it's very weak and the O2 saturation is so low, it's not showing up on it." The operator said, "Keep doing the compressions. Whoever else is there, open the door. Don't stop the compressions."

On Sunday, November 13, 2016, at about 6:40 a.m., paramedics and police responded to a dispatch call regarding a female who had fallen down the stairs and was not breathing. When the paramedics entered, Sills was kneeling over Susann. Sills was not administering CPR or doing chest

---

[2] For the first time at trial, Daughter testified that the dogs were surrounding Susann and were yanking at the scarf on her neck. Daughter and Sills did not say anything about the dogs when talking to first responders or the police later that morning.

compressions. The two children were seated nearby.

Susann had no pulse and was not breathing. Paramedics determined that she was deceased at the scene. Sills told the paramedics that he had found Susann facing down on the stairs and he and Daughter had pulled her down to the floor (Sills said nothing about the dogs). Sills stated that he had last seen Susann about six hours earlier at bedtime. Sills said that Susann had gotten "out of bed at an unknown time and went downstairs because she had a migraine."

*Homicide Investigation*

A deputy sheriff who had responded to the 911 call spoke to the paramedics who told him that Susann was deceased. The deputy spoke to Sills, who told him Susann had suffered from chronic migraine headaches and vascular disease. Sills told the deputy that he was a doctor and had been treating Susann with medication for the last two years. Homicide detectives interviewed Son and Daughter separately in the home later that morning.

A deputy coroner responded to the Sills' home to investigate the death. The deputy coroner saw abrasions throughout Susann's face, bruising on her inner arm, a ligature mark on the front of the neck, and injuries on left shoulder and back. The coroner opined that Susann's observed injuries were inconsistent with a singular fall down the stairs.

Forensic investigators arrived and observed that Susann was on the floor at the base of the stairs with one foot on the stairs and the other foot on the floor. Susann had one shoe on her left foot (a clog), and the other shoe was on the sixth step from the bottom of the staircase. Susann had a pulse oximeter on her finger and medical pads used to detect a heartbeat. She was wearing a pink shirt and pajama bottoms. Later DNA testing revealed that

5

both her blood and Sills's blood were on her clothing. Sills's blood was also found under Susann's fingernails, on her right palm, left knuckle, neck, right knuckle, left wrist, right hand, upper chest, and forehead.

Near Susann was an empty bottle of Tramadol, and an empty stainless steel pot on the floor. Susann's purse was near her body at the bottom of the stairs. There was a red floral print scarf in the sitting room. The scarf had blood on it, which was later matched to both Susann's and Sills's DNA. There was no visible blood or damage to the stairs and railings, and no blood on the floor where Susann was lying.

In Daughter's room there were clumps of Susann's hair found on the floor. Sills's blood was found on a curtain and the nightstand, and both his and Susann's blood were found on the wall.

Sills had a cut at the top of his forehead, a red mark on the second knuckle of his right hand and an abrasion on his arm. Sills was wearing blue jeans and a Jeep t-shirt that had both his and Susann's blood on it. Daughter said that Sills wore pajamas and a T-shirt to bed the night before, but she did not recall what was on his T-shirt. Forensics found a single green T-shirt in a washing machine in a laundry room that was damp, but the shirt was not collected because it had no apparent blood on it.

Susann's toxicology results revealed the presence of Tramadol, an opioid used to treat moderate to severe pain, including pain from migraines. The levels were consistent within a therapeutic range. Side effects could possibly cause someone to get dizzy, a slight headache, or nausea. Susann's toxicology results also showed very low levels of diazepam or Valium, a general antidepressant prescribed for anxiety that would provide pain relief and possibly cause some dizziness or nausea.

*Pathology Findings and Opinions*

On November 17, 2016, Dr. Nicole Ellis, a forensic pathologist, performed an autopsy of Susann's body. Ellis worked for Juguilon Medical Corporation, which contracts autopsy services to the Orange County Coroner. Ellis had performed over 4,000 autopsies with nine of them involving strangulation.

Susann weighed 109 pounds and was 66 inches in height. Susann had numerous injuries all over her body. The injuries included bruises on the right side of her chest, her left shoulder, the inside of her left arm, her right hip, her legs, and her chin. There were abrasions on Susann's right forearm, left wrist, her legs and the tops of both of her feet. Dr. Ellis testified that Susann's bruises on her hands and wrists were consistent with defensive type injuries. Ellis said that "to have abrasions all over the face and all over the ears and all over the neck were not consistent with a fall."

Susann had some lividity, or the pooling of blood that occurs after death, in her back and the back of her legs. Dr. Ellis testified that posterior lividity was consistent with Susann being on her back after death, rather than lying face down as Sills described finding Susann's body on the stairs.

Susann had bleeding in her scalp and a brain bleed that was indicative of a head trauma. On the exterior of her eyes were "periorbital bruising or black eyes." Susann had a three-inch abrasion across the front of her neck, as well as abrasions to the side of her neck. On the inner surface of Susann's eyelids were petechial hemorrhages, which are ruptures of tiny blood vessels. Dr. Ellis explained that these types of "hemorrhages are significant when there are compressive-type neck injuries because they are a sign of strangulation."

As part of the initial internal examination during the autopsy,

Dr. Ellis observed hemorrhaging in the front muscles of Susann's neck. Susann "also had a fracture in thyroid cartilage which is part of the throat. And she also had a fracture in her neck at C3, which is sort of behind the area of the thyroid cartilage fracture." Ellis testified that fracture to the C3 vertebra was "significant because that could have caused her death. It was a significant blunt force injury. It could have been inflicted at the same time as the strangulation or it could have been inflicted at a slightly different time. But it is significant because it is fatal."

At the time of the autopsy, Dr. Ellis did not give a cause of death. After further testing and consultation, Ellis concluded that "Susann's cause of death was from ligature strangulation."

Dr. Ellis testified that a vertebra fracture can be caused during a strangulation, but it is not common: "People break their neck when they are in motor vehicle accidents or falls. Anything that is a velocity impact on the neck." Ellis said that hypothetically a person hitting the back of the neck on a piece of furniture, or falling down the stairs could cause such a break. However, Ellis said that Susann's vertebrae fracture occurred before her death, which was caused by ligature strangulation.

Dr. Ellis observed that Susann's hyoid bone was intact, but that bone is not necessarily involved in strangulation. Ellis said that there was evidence of both manual and ligature strangulation. Ellis testified that given the hemorrhaging in the neck and the eyes, and "the mark across the front of the neck, it looked like it was cause by a ligature." A ligature "is anything that can be wrapped around the neck and cause compression." Ellis said that strangling a person for 20 to 30 seconds will likely cause the individual to pass out. Ellis said that it takes on average four minutes of consistent pressure for the person to die. In the case of strangulation, the hyoid bone is

8

not always broken, but Ellis would expect to see strap muscle hemorrhage, petechia in the eyes, and bruising (all of which she observed).

Dr. Anthony Juguilon, a chief forensic pathologist, and Dr. Ellis' supervisor, reviewed all of the records and also independently determined that the cause of Susann's death was ligature strangulation. Juguilon had performed close to 9,000 autopsies with hundreds of them involving strangulation. Juguilon testified that a C3 vertebra fracture could be fatal if there was an associated spinal cord injury, but in Susann's case there was no spinal cord injury associated with the C3 fracture.

Dr. Juguilon said some of Susann's "injuries could be explained by a fall, but the totality of the injuries suggest an assault rather than a fall down the stairs." Juguilon testified, "in particular, the injuries to the head and face and the neck, that constellation of findings can only be explained by strangulation." Juguilon said that Susann had "a pretty distinctive ligature mark, and that's characteristic of a ligature strangulation." Juguilon testified that Susann also had "symmetrical hemorrhage in that neck musculature. So that indicates sustained neck compression."

*Court Proceedings*

On June 1, 2022, the People filed an information charging Sills with one count of murder.

On October 31, 2023, an 18-day jury trial began.

During the defense portion of the trial, Dr. Rod Mortazavi testified that he currently worked as an emergency room physician. Mortazavi looked at photographs of Sill's injury to his head, which was photographed on the day of Susann's murder. Mortazavi opined that the injury was from five to eight days old. Mortazavi also opined that an injury to

9

Sills' forearm appeared to be from an injury or a burn and was from between seven and 14 days old. Mortazavi said that most of Susann's injuries were consistent with falling down the stairway. However, Mortazavi agreed that the bilateral bruising of Susann's strap muscles was likely not from a fall, and the constellation of her injuries were due to strangulation.

Dr. Juguilon was recalled by the defense and testified that if there was a person in a physical struggle, the time frame for death from strangulation can change but will still be in the three to five minute range. Juguilon testified Susann's C3 fracture was not the cause of death because he saw no injuries to the spinal cord. Juguilon opined Susann's injuries excluding the strangulation were not consistent with a fall down the stairs. Juguilon testified that Susann's strangulation would not have been caused by a dog tugging on a loose scarf. Rather, Juguilon said that bilateral hemorrhaging of the strap muscles in Susann's neck required direct and sustained pressure on both sides of the neck.

The defense presented evidence that dog DNA was found in the swabs from the front and back of the scarf that Daughter said she removed from around Susann's neck. During 2016, nurse N. Rickers worked for Sills and Susann in their Carlsbad fertility clinic. Rickers testified that Sills and Susann seemed to get along well.

On December 19, 2023, after about four hours of deliberation, the jury found Sills guilty of the second degree murder. The trial court later sentenced Sills to 15 years to life in prison.

Sills filed a timely notice of appeal. This court ordered the trial court to transmit to this court all of the exhibits that were admitted into evidence (we have received and reviewed the exhibits).

10

II.

DISCUSSION

Sills claims the trial court erred by not instructing the jury on involuntary manslaughter as a lesser included offense. Sills argues "the jury could infer that [he] assaulted [Susann] causing her death, but [he] did not necessarily realize and consciously disregard the danger to human life his assaultive conduct posed." We disagree.

We review instructional error claims de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) We determine whether the trial court fully and fairly instructed the jury on the applicable law. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

In this discussion we will: A) review relevant principles of law; B) review the trial court proceedings; and C) apply the facts to the law.

*A. Relevant Legal Principles*

"'The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request.'" (*Souza, supra,* 54 Cal.4th at p. 115.) This duty arises even when the lesser included offense is inconsistent with the defendant's trial theories, or contrary to the defendant's wishes. (*People v. Breverman* (1998) 19 Cal.4th 142, 155, 162–163.)

A trial court's duty to instruct on its own motion "'encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser.' [Citations.] 'To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial— that is, it must be evidence from which a jury composed of reasonable persons

11

could conclude that the facts underlying the particular instruction exist.'" (*Souza, supra,* 54 Cal.4th at pp. 115–116.)

"Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense." (*People v. Shockley* (2013) 58 Cal.4th 400, 403.) A court is required to "instruct the jury on a lesser included offense only '[w]hen there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of' the lesser offense." (*Id.* at p. 404.)

"[A] trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support." (*People v. Breverman, supra*, 19 Cal.4th at p. 162.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*Ibid.*)

There is no duty to instruct on a lesser included offense when the evidence supporting the instruction is based on mere speculation; such an instruction is only required when the lesser included offense is supported by ""evidence that a reasonable jury could find persuasive.""" (*People v. Steskal* (2021) 11 Cal.5th 332, 345; see *People v. Wilson* (1992) 3 Cal.4th 926, 942 ["Speculation is an insufficient basis upon which to require the trial court to give an instruction on a lesser included offense"]; *People v. Evers* (1992) 10 Cal.App.4th 588, 596 ["minimal or insubstantial" evidence will not suffice].)

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) "For purposes of Section 187, malice may be express or implied. [¶] (1) Malice is express when there is manifested

a deliberate intention to unlawfully take away the life of a fellow creature. [¶] (2) Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a).)

Generally, first degree murder involves the additional element of premeditation and deliberation; all other murders are of the second degree. (*People v. Chavez* (2018) 22 Cal.App.5th 663, 682.) Manslaughter (voluntary and involuntary) is a lesser included offense of murder, if supported by substantial evidence. (*People v. Elmore* (2014) 59 Cal.4th 121, 133.)

"When a homicide, committed with malice, is accomplished in the heat of passion or under the good faith but unreasonable belief that deadly force is required to defend oneself from imminent harm, the malice element is 'negated' or, as some have described, 'mitigated'; and the resulting crime is voluntary manslaughter, a lesser included offense of murder." (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30 (*Brothers*).) "Involuntary manslaughter, in contrast, [is the] unlawful killing of a human being without malice. (§ 192.) It is statutorily defined as a killing occurring during the commission of 'an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, [accomplished] in an unlawful manner, or without due caution and circumspection.' (§ 192, subd. (b).)" (*Brothers*, at p. 31.)

"Although the statutory language appears to exclude killings committed in the course of a felony, the Supreme Court has interpreted section 192 broadly to encompass an unintentional killing in the course of a noninherently dangerous felony committed without due caution or circumspection." (*Brothers*, *supra*, 236 Cal.App.4th at p. 31.) Further, "an unlawful killing in the course of an inherently dangerous assaultive felony

13

without malice" is also manslaughter; therefore, "an instruction on involuntary manslaughter as a lesser included offense must be given when a rational jury could entertain a reasonable doubt that an unlawful killing was accomplished with implied malice during the course of an inherently dangerous assaultive felony." (*Id.* at pp. 33–34.)

"However, when . . . the defendant indisputably has deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law, and no material issue is presented as to whether the defendant subjectively appreciated the danger to human life his or her conduct posed, there is no sua sponte duty to instruct on involuntary manslaughter." (*Brothers*, *supra*, 236 Cal.App.4th at p. 35.)

## B. Trial Court Proceedings

At the conclusion of the evidence, there was a discussion outside of the presence of the jury. The trial court noted that the jury instructions "was pretty much agreed on." The court stated, "I think both counsel as well as myself, agreed that there was not evidence of an involuntary manslaughter. So we weren't going to give an instruction on involuntary manslaughter." Both counsel agreed with this statement on the record.

The trial court instructed the jury as to the lesser included offense of voluntary manslaughter (CALCRIM No. 570) as follows:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the

14

influence of intense emotion that obscured his reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." (CALCRIM No. 570.)

The trial court instructed the jury as to the greater crime of murder (CALCRIM No. 520) as follows:

"To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person; [¶] AND [¶] 2. When the defendant acted, he had a state of mind called malice aforethought. [¶] There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant had *express malice* if he unlawfully intended to kill. [¶] The defendant had *implied malice* if: [¶] 1. He intentionally committed the act; [¶] The natural and probable consequences of the act were dangerous to human life; [¶] *At the time he acted, he knew his act was dangerous to human life*; AND [¶] He deliberately acted with conscious disregard for human life." (Third italics added.)

## C. Application and Analysis

A trial court is not obligated to instruct on involuntary manslaughter when there is no evidence in the record to support it. (*People v. Smith* (2021) 70 Cal.App.5th 298, 308–313 (*Smith*).) In *Smith*, defendant Smith had an argument with her mother Anne, in which she hit Anne "in the head repeatedly with a hammer, killing her." (*Id.* at p. 303.) "According to a medical examiner, Anne's cause of death was '[b]lunt force injuries including cranial cerebral injuries due to strikes by [a] hammer.' [¶] In addition to fatal

15

head injuries, Anne had a number of defensive injuries consisting of lacerations and contusions on both forearms and on one of her hands, as well as fractures to her left wrist and forearm." (*Id*. at p. 304.) Smith testified at trial that on the morning of the killing, "Anne made several demeaning comments to Smith, and a heated verbal argument ensued." (*Ibid*.) Smith testified that she was in a dream like state at the time of the killing, and she called the police the following morning. (*Id*.at pp. 304–305.)

A jury found Smith guilty of second degree murder, and found her to be "legally sane at the time she committed the offense." (*Smith*, *supra*, 70 Cal.App.5th at p. 302.) On appeal, Smith argued "that the trial court erred in failing to instruct the jury, sua sponte, on involuntary manslaughter as an uncharged lesser included offense to the charged offense of murder." (*Id*. at p. 307.) The Court of Appeal disagreed: "The trial court did not err in failing to instruct the jury on the uncharged lesser included offense of involuntary manslaughter because there is no substantial evidence in the record to support the giving of the instruction." (*Ibid*., italics omitted.)

The *Smith* court assumed "that the jury could have found that Smith was in a dream-like state at the time of the killing and lacked express or implied malice while repeatedly striking the victim in the head with a hammer. However, if the jury so found, the jury could *not* also have found that Smith, while acting in a dream-like state, had the intent to commit an assault with a deadly weapon." (*Smith*, *supra*, 70 Cal.App.5th at p. 311.) The court concluded that "because the commission of an assault requires an intentional act, a reasonable jury could not find that Smith was in a dreamlike state and also find that she was acting in an intentional manner sufficient to commit an assault. Because there was no evidence that would have supported a conclusion that Smith committed the lesser offense of an

16

assault-based involuntary manslaughter, but not the greater offense of murder, no lesser included offense instruction on involuntary manslaughter was warranted. In short, Smith either committed murder, voluntary manslaughter, or no offense at all." (*Id*. at pp. 311–312, fn. omitted.)

Here, in order for the trial court to instruct the jury on involuntary manslaughter, there would have had to have been some evidence in the record that Sills intentionally committed an assault (or spousal abuse), but he did <u>not</u> subjectively know that his assaultive conduct was dangerous to human life. But here, similar to *Smith*, there is simply no evidence in the record to support such a theory. (See *People v. Wilson*, *supra*, 3 Cal.4th at p. 942 ["Speculation is an insufficient basis upon which to require the trial court to give an instruction on a lesser included offense"].) Indeed, the evidence that Sills was a currently practicing medical doctor supports a reasonable inference that Sills did, in fact, know that his assaultive conduct (which included applying a ligature to Susann's neck) was dangerous to human life.

Thus, we find that the trial court did not commit an instructional error, and we therefore affirm Sills's conviction for second degree murder.

Sills argues on appeal that the People "relied on the manner and cause of death, strangulation, as circumstantial evidence of Scott's mental state. [Citation.] But evidence that [Susann] died from a fractured vertebra caused by hitting her head during an assault supported an inference that Scott acted recklessly and did not realize that his conduct posed a danger to [Susann's] life, requiring the trial court to sua sponte instruct on involuntary manslaughter." We disagree.

Dr. Ellis and Dr. Juguilon both testified that the cause of Susann's death was from ligature strangulation. No other expert offered a conflicting opinion as to the cause of Susann's death. It is true that Ellis

17

could not explain how Susann's neck was fractured, that it could be a fatal injury, and when presented with a hypothetical question, Ellis testified that it was *possible* that the C-3 vertebra fracture could have been caused by Susann's neck hitting a dresser with enough velocity.

But even if we were to assume for the sake of argument that Sills was in the process of physically assaulting Susann, which then resulted in her head hitting the dresser, that does not establish that Sills did not subjectively appreciate the danger to Susann's life his assaultive conduct posed. (See *Brothers*, *supra*, 236 Cal.App.4th at p. 35 ["when . . . the defendant indisputably has deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law, and no material issue is presented as to whether the defendant subjectively appreciated the danger to human life his or her conduct posed, there is no sua sponte duty to instruct on involuntary manslaughter"].)

Indeed, the totality of the evidence of Sills's assaultive conduct included multiple bruises and abrasions all over Susann's body, a fracture to her vertebra, ligature marks around her neck, petechial hemorrhaging in and around the eyes, and symmetrical injuries to Susann's neck muscles, which could have only been caused by symmetrical neck pressure. Given this undisputed evidence, we conclude that no reasonable juror could find that Sills, a trained and practicing medical doctor, assaulted Susann to such an extreme without subjectively appreciating the danger his conduct posed. (See *People v. Shockley, supra,* 58 Cal.4th at p. 403 ["Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense"].)

Sills argues that the case of *People v. Vasquez* (2018) 30

18

Cal.App.5th 786 (*Vasquez*), compels a different result. We disagree.

In *Vasquez*, a defendant and an accomplice repeatedly punched E. Smith, knocking him to the ground. (*Vasquez, supra*, 30 Cal.App.5th at p. 791.) The defendant stomped the victim, and the accomplice threw a trash can at him. The victim died from a neck fracture that occurred just below the victim's jawline. (*Ibid*.) The victim had metal rods in his neck from a prior surgery, which "compromised Smith's neck strength and made him more susceptible to a neck injury in the area." (*Ibid*.) At defendant's murder trial, the court refused defendant's request, and did not instruct the jury on involuntary manslaughter. (*Id*. at p. 790.) The Court of Appeal disagreed and reversed. (*Id*. at p. 803.) The court found it significant that: "The weakness of Smith's neck was not visible externally." (*Id*. at p. 796.) The court concluded that: "A reasonable juror could have inferred from this evidence that the blows were not particularly severe and further inferred that defendant believed beating up Smith would injure him but not kill him." (*Ibid*.)

We need not decide whether we agree with *Vasquez* because it is readily distinguishable from the facts in this case. Here, unlike the victim in *Vasquez*, there was no evidence that Susann had a hidden vulnerability to sustaining a fracture to the vertebrae in her neck. And as we have discussed, Sills was a practicing medical doctor who presumably would have known about the consequences of the totality of his assaultive actions. Moreover, given Sills's use of a ligature on Susann's neck, which occurred at or near the time of the C3 fracture, we find that no reasonable juror could have concluded that Sills "lack[ed] a subjective awareness that his conduct carrie[d] "'a high degree of probability that it [would] result in death.'"" (*Vasquez, supra*, 30 Cal.App. 5th at p. 795.)

To reiterate and conclude, we find that the trial court did not

have a sua sponte to duty to instruct the jury on involuntary manslaughter as a lesser included offense because it was not supported by the evidence. (See *People v. Wilson, supra,* 3 Cal.4th at p. 942 ["Speculation is an insufficient basis upon which to require the trial court to give an instruction on a lesser included offense"]; *People v. Evers, supra,* 10 Cal.App.4th at p. 596 ["minimal or insubstantial" evidence will not suffice].) In short, Sills "either committed murder, voluntary manslaughter, or no offense at all." (See *Smith, supra,* 70 Cal.App.5th at p. 312, fn. omitted.)

In any event, even if we were to find an instructional error, we would not find the error to be prejudicial.

"The failure to instruct on a lesser included offense in a noncapital case does not require reversal 'unless an examination of the entire record establishes a reasonable probability that the error affected the outcome.'" (*People v. Thomas* (2012) 53 Cal.4th 771, 814, fn. omitted.) "Under such circumstances . . . the error must therefore be evaluated under the generally applicable California test for harmless error . . . ." (*People v. Breverman, supra,* 19 Cal.4th at p. 176; see *People v. Watson* (1956) 46 Cal.2d 818, 836 [an error is generally harmless under the state test unless it appears "reasonably probable" that the defendant would have achieved a more favorable result had the error not occurred].)

"'Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.'" (*People v.*

20

*Thomas, supra,* 53 Cal.4th at p. 814.) [3]

Here, the evidence supporting the jury's verdict of second degree murder was strong. This evidence included the photographs introduced at trial demonstrating Sills's assaultive conduct, which this court has had the opportunity to review. Further, both pathologists testified at trial that the cause of Susann's death was by ligature strangulation. And although Dr. Ellis considered the possibility that the vertebra fracture may have been fatal, Ellis ultimately concluded that the Susann's cause of death was ligature strangulation. Moreover, even the defense's expert conceded that Susann's constellation of injuries was consistent with strangulation.

In sum, the evidence strongly supports the jury's finding that Sills killed Susann with malice aforethought (i.e., murder). (See *People v. La Vergne* (1966) 64 Cal.2d 265, 272 ["homicide by strangulation indicates malice"]; *People v. Pool* (2008) 166 Cal.App.4th 904, 908 [defendant who strangled his victim "'acted with knowledge of the danger to and conscious disregard for life'"]; *People v. Rowland* (1982) 134 Cal.App.3d 1, 9 [evidence of strangulation "is a means of establishing malice aforethought"].)

_____

[3] In supplemental briefing, Sills argues that the federal harmless-error test applies when a trial court fails to instruct on *involuntary manslaughter* as a necessarily lesser included offense of murder. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [an error is generally prejudicial under the federal test unless the reviewing court finds that the error "was harmless beyond a reasonable doubt"].) We disagree. This proposition runs counter to well-established case law. (See *People v. Breverman, supra,* 19 Cal.4th at p. 176.) Further, the opinion that Sills relies on in support of this proposition is inapposite. (See *People v. Schuller* (2023) 15 Cal.5th 237, 260 [federal harmless-error test applies to instructional error on imperfect self-defense (*voluntary manslaughter*)].)

## III.

## DISPOSITION

The judgment is affirmed.


MOORE, ACTING P. J.

WE CONCUR:


GOODING, J.


BANCROFT, J.*


*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.